[Civ. No. 33204. Second Dist., Div. One. May 25, 1970.]

KENNETH CLEMENS, Plaintiff and Appellant, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,
Defendants and Respondents.

4

## COUNSEL

Irving H. Green, Samuel Shore, William Strong and Eliot B. Feldman for Plaintiff and Appellant.

Belcher, Henzie & Biegenzahn, Robert D. Walker, Haight, Lyon & Smith, Henry F. Walker, Gilbert, Thompson, Kelly, Crowley & Jennett, James B. Crowley and Jean Wunderlich for Defendants and Respondents.

## OPINION

**THOMPSON, J.**—Appellant, plaintiff in a medical malpractice action, has appealed from an adverse judgment given pursuant to a jury verdict. By reason of *People* v. *Hutchinson,* 71 Cal.2d 342 [78 Cal.Rptr. 196, 455 P.2d 132], decided while this appeal was pending, we reverse with instructions to the trial court to hold a new hearing on appellant's motion for a new trial.

### Facts

Viewed as it must be in the light most favorable to the verdict and judgment, the record discloses the following.

In June of 1958, a tumor about the size of a marble was excised from appellant's upper right arm by Dr. Kornblatt at Bay Cities Community Hospital. The tumor recurred higher on the arm. On August 4, 1961, when the tumor had grown to about seven by nine centimeters, it was again excised by Dr. Norcross at Gardena Hospital. Approximately three months later, the tumor reappeared, this time still further up the arm and extending into the armpit area. Dr. Norcross diagnosed the tumor as malignant. It was approximately the size of a baseball and appeared to be a fibrous tumor with strands or tentacles moving outward from the margin.

Dr. Norcross determined that his treatment of choice for the third recurrence of the tumor was a wide excision including the possibility of a forequarter amputation, the removal of the arm and the shoulder. Dr. Norcross, however, was unable to treat the third tumor because appellant could not afford private hospitalization. He therefore sent appellant to respondent U.C.L.A. Medical Center for a determination of what should be done and "whatever treatment they felt would be proper."

Appellant was admitted to the U.C.L.A. Medical Center Hospital on

January 22, 1962, after prior examinations while he was in an out-patient status. Within the two-week period prior to admission, the rate of growth of the tumor increased. Dr. Gaal, one of the respondents, examined appellant on January 23. Gaal told appellant that a course of action would be decided upon after studies were made. Gaal and Dr. Smart, another of respondents, after study determined that the tumor should be excised and analyzed by a pathologist. They determined also that if the tumor proved malignant as suspected, they would make a further decision to merely close the wound, to perform the forequarter amputation, or to proceed with a new procedure of chemotherapy known as an isolation perfusion. Their determination of alternatives was based upon their examinations of appellant, the medical history of the tumors, and appellant's age, 60 years.

The operation upon appellant was scheduled for January 25. On January 24, Dr. Gaal visited appellant. Gaal told appellant that on the basis of evidence at hand the tumor was malignant and that it was capable of spreading and causing death. Gaal stated that in his judgment it would be inadvisable to simply re-excise a tumor which had already twice recurred, which was growing rapidly, and which, on clinical grounds, appeared to be quite malignant. He told appellant of the availability of the forequarter amputation, the removal of the arm and shoulder, and of the alternative technique of the isolation perfusion. Gaal told appellant that the forequarter amputation was an extremely incapacitating, mutilating procedure that he would recommend if there were no alternative. He informed appellant that there was another newer technique, the isolation perfusion. Gaal explained the isolation perfusion process in detail. He stated that the method involved the lowering of body temperature of the patient, the isolation of the blood supply to the portion of the body to be treated, the injection of toxic chemicals into the isolated portion, and the properties of the chemicals in destroying cells in general and tumor tissue in particular. Gaal told appellant that the isolation perfusion carried inherent risks including the possible risk of an inflammation in the artery which might result in the loss of the arm or some portion of it.

Appellant responded to Gaal's explanation by stating that he understood, that he was somewhat fearful, and that he agreed to proceed as Gaal had outlined. There is testimony which may or may not have been accepted by the jury[1] that Dr. Smart told appellant in order to reassure him that perhaps Dr. Gaal had overemphasized the complications inherent in the isolation perfusion procedure.

---

[1]Gaal testified that Smart was not present when he explained the procedure to appellant. Smart testified he made his reassuring comments at that time. The jury was free to believe Gaal. They also could have determined that the reassurance was given after the consent had been obtained.

In 1962 the isolation perfusion procedure was new but had ceased to be experimental. Dr. Smart had utilized the technique as early as 1959. He joined a perfusion team at the U.C.L.A. Medical Center on July 1, 1961. Isolation perfusions were performed there as a standard technique prior to the operation upon appellant.

The operation commenced as scheduled. Doctors Gaal and Smart were present as were Dr. Rochlin, Dr. Smart's superior on the perfusion team, Dr. Blakely a fourth year resident in surgery, and Dr. Dillon, the anesthesiologist. Dr. Longmire, chief of surgery at the U.C.L.A. Medical Center and the supervisor of all the other doctors participating in the operation, was also present. The tumor was excised by Dr. Gaal. It was submitted to a pathologist for examination and a preliminary report based upon microscopic slides made from frozen sections of the excised tumor. Fifteen minutes after the tumor was submitted to him, the pathologist reported that, based upon the frozen section, the tumor appeared to be a myxosarcoma, a "low grade malignant mesenchymal tumor" and that it might have been "cleared" i.e., removed, by the surgery. The frozen section report was, however, not conclusive as to the nature of the tumor and could not be completely accurate in its estimate that all tumor cells had been excised since tentacles or lesions may have remained which were not disclosed by the section. The frozen section report differed in its analysis of the type of tumor from reports of prior excisions which had described the tumor as showing elements of fibrosarcoma.

After receipt of the pathologist's report, the physicians participating in the operation were in disagreement as to the procedure to be followed. Based upon the report, a visual examination of the area from which the tumor had been removed and the clinical history, Dr. Gaal and Dr. Dillon, the anesthesiologist, were of the opinion that the surgery should be terminated. Drs. Smart and Rochlin, based also on the report, visual examination and clinical history, concluded that the isolation perfusion was necessary. Dr. Longmire, the chief of surgery and the physician in ultimate control of the operation, determined that the isolation perfusion was necessary and ordered that it be performed. The decision to proceed with the chemotherapy was based upon the following factors: (1) the history, size, and location of the tumor indicated that any further recurrence would extend into the chest cavity and prove fatal; (2) the clinical history indicated that the tumor was becoming increasingly malignant; (3) Dr. Longmire's personal experience with tumors of the type here involved indicated a high incidence of recurrence; and (4) Dr. Longmire's personal experience with isolation perfusion indicated it was beneficial.

The isolation perfusion was performed. Chemicals were administered pursuant to a formula previously determined by Dr. Rochlin. Dr. Smart

supervised the procedure. The actual injection of chemicals was performed under his direction by Nurse Schiner. The dosages of chemicals and the manner of their injection were proper.[2] The isolation perfusion was completed.

Approximately one week after the surgery, appellant developed an inflammation of the artery. He also developed a blood clot in his right arm which was removed surgically on February 2. Appellant continued to have difficulty with the circulation in his right arm. Various procedures were employed to increase the blood flow. Ultimately, due to restricted circulation and gangrene, it was necessary to amputate four fingers of appellant's right hand beyond the first joint. After the operation, appellant refused advice to exercise his arm and shoulder and to take physiotherapy.

Appellant filed the action which is now before us claiming damages in the amount of $500,000 for the amputation and restriction in use of his arm. After an extended trial, the matter was submitted to a jury which gave its verdict for the defendants (respondents). This appeal followed.

### Issues on Appeal

In his brief, appellant contends: (1) the evidence establishes respondents' liability as a matter of law; (2) the trial court erred in not instructing on the doctrine of res ipsa loquitur, in denying other instructions requested by appellant, in modifying proposed jury instructions, and in giving instructions requested by respondents; (3) unspecified rulings and conduct of the trial judge denied appellant a fair trial; and (4) misconduct of a juror requires reversal of the judgment.

### Sufficiency of the Evidence

Appellant contends that the evidence in the case at bench is insufficient to support the jury verdict for respondents. He argues that the evidence establishes as a matter of law that: (1) he did not give his informed consent to the isolation perfusion; (2) the procedure was unnecessary so that its use was negligent; and (3) the procedure was negligently performed. Appellant's arguments are not supported by the record.

*Informed Consent.* Appellant's argument that the record establishes that he did not give his informed consent to the isolation perfusion raises a question of fact. (*Kritzer* v. *Citron,* 101 Cal.App.2d 33 [224 P.2d 808].)

Consent to a surgical procedure may be express or implied, oral

---

[2]There is conflicting evidence with respect to the timing of the infusion of the chemicals. It is, of course, the function of the jury and not of this court to draw appropriate inferences from that conflict.

or written. (*Bradford* v. *Winter,* 215 Cal.App.2d 448, 454 [30 Cal.Rptr. 243] and cases there cited.) ▇▇ Here there is ample evidence that appellant consented expressly and orally to the isolation perfusion procedure. Here, also, there is ample evidence that the consent was an informed one. ▇ Dr. Gaal stated that the procedure was a "new" one and described it in detail to appellant. He specifically informed appellant of the possibility of the precise complication upon which appellant bases his lawsuit. Appellant, with knowledge of the detail of the procedure and the potential complications, orally consented to it.

Appellant argues, however, that he was not told the isolation perfusion procedure was experimental in nature, that the reassurance given him by Dr. Smart vitiated his consent, and that in any event once there was a difference of opinion among his physicians with respect to the desirability of the isolation perfusion further consent should have been sought from him or his wife.

Appellant's argument that he should have been told that the chemotherapy procedure employed was an experimental one is answered by the existence in the record of substantial evidence that the process was not experimental. Moreover, the trial court expressly instructed the jury that a physician seeking consent to a "new or experimental" procedure should inform the patient that it is new or experimental when seeking consent to it. The jury must be presumed to have followed that instruction making its implied finding of informed consent.

Appellant's argument that his consent was vitiated by Dr. Smart's statements is similarly without support in the record. There is testimony that, in an effort to allay serious apprehension evidenced by appellant after Dr. Gaal's explanation of the contemplated procedure, Dr. Smart stated that perhaps Dr. Gaal had overemphasized the complications of the procedure. There is, however, nothing in the record to indicate that Dr. Smart's statement preceded appellant's consent. Nor can we say that anything other than a jury question with respect to informed consent would have been presented if the reassurance had, in fact, been given before the consent was obtained.

No authority is cited in support of appellant's assertion that the ordinary principles of informed consent are inapplicable where, during the course of a surgical procedure to which informed consent has been given, the physicians performing the operation may have a difference of opinion. Appellant asserts that in such a situation there is a legal duty imposed upon the physicians to terminate the procedure so that the disagreement may be explained to the patient or his relatives and their further consent sought. The imposition of such a duty upon the medical profession would

be both unrealistic and dangerous. The best interest of the patient may require that an on-the-spot decision be made concerning the medical procedure to be followed and that the decision be carried out. Termination of an operation to enable further consent to be secured could endanger the patient. We thus conclude that there is no duty as a matter of law to suspend surgery because the physicians participating in it are not in full accord as to the course it is to follow.

The difference of opinion may present a factual basis on which a jury might conclude that the procedure followed was negligent. The factual issue so raised was presented to the jury in the case at bench. The jury determined that the continuation of the isolation perfusion was not negligent. That determination is supported by substantial evidence in the form of expert medical opinion that appellant's chances of recovery were best served by the method employed.

*Necessity for Isolation Perfusion.* Appellant argues that the record establishes as a matter of law that the tumor had been completely excised prior to the isolation perfusion and that the latter procedure was unnecessary to prevent another recurrence. This argument ignores the basic principle that we must view the evidence in the light most favorable to the judgment. The record is by no means lacking in evidence that good medical practice called for the use of the procedure employed.

*Negligence in Isolation Perfusion.* Appellant contends that the record establishes as a matter of law that there was negligence in the manner in which the isolation perfusion was performed. This argument repeats the vice of ignoring the evidence which supports the verdict and judgment. Moreover, the record contains only slight evidence of negligence in the conduct of the perfusion. Appellant points to discrepancies in the testimony of defense witnesses concerning the time intervals during which the chemotherapy was administered but not to testimony that indicates that the use of any one of the time intervals was not in accord with sound medical practice. Appellant also states in his brief that an excessive quantity of the active chemical was injected during the isolation perfusion. That statement is unsupported by any record reference. Our own examination of the record indicates that what evidence there is of an overdose of chemical is rebutted by other substantial evidence.

### Res Ipsa Loquitur

Appellant tendered an instruction (BAJI 206, 1/67) that the doctrine of res ipsa loquitur is unconditionally applicable to the case at bench. He also tendered an instruction that the doctrine of conditional res ipsa loquitur (BAJI 214-W, 7/61) is applicable. Both instructions were

refused by the trial court. We conclude that the trial court was correct in refusing the instructions as tendered by appellant.

The record of the case at bench will not support an instruction that the doctrine of res ipsa loquitur is unconditionally applicable. ▮ That doctrine applies only if the evidence establishes without contradiction that: (1) the accident or injury is of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it is caused by an agency or instrument within the exclusive control of the defendant; and (3) it is not due to any voluntary action or contribution on the part of the plaintiff. (*Wolfsmith* v. *Marsh,* 51 Cal.2d 832, 835 [337 P.2d 70] and cases there cited.) ▮ The evidence in the record before us by no means establishes without contradiction that the injury to appellant is of a kind that ordinarily does not occur in the absence of someone's negligence.

The propriety of the conditional res ipsa loquitur instruction proposed by appellant presents a closer question, but one which must be resolved against him. That conclusion is impelled by deficiencies in the wording of the instruction as proposed and by the lack of an evidentiary base in the record sustaining the applicability of the instruction.

▮ Where there is evidence from which the jury may properly find that the three conditions necessary to the applicability to the doctrine are present, the trial judge must instruct that res ipsa loquitur is applicable if the jury so finds. ▮ It is again lack of adequate evidence of the first of those conditions—that the injury is of a kind that ordinarily does not occur in the absence of negligence—that renders such an instruction inappropriate to the case at bench.

The decisional law of California recognizes that the probability of a negligent cause in medical malpractice actions may be supplied by: (1) expert testimony; (2) common experience; or (3) circumstantial evidence in particular cases. The record of the case at bench discloses no expert testimony that the injury to appellant is one that ordinarily would not occur without negligence. While there is testimony that the injury was unexpected and unusual in isolation perfusion when due care is exercised, that testimony is in itself insufficient without further testimony that the unexpected or unusual result was probably the consequence of negligence. (*Siverson* v. *Weber,* 57 Cal.2d 834, 839 [22 Cal.Rptr. 337, 372 P.2d 97].) That further testimony is lacking here.

The lack of expert testimony that the injury to appellant was probably the result of negligence cannot be remedied in the case at bench by reference to common experience. The procedure out of which the injury arose was a highly complex one and the particular injury was a rare but never-

theless potential complication of the procedure of which appellant had been warned before he consented to the operation.

We conclude also that the facts before us do not bring the case at bench within those cases which have held that the necessary condition may be found by the jury upon the basis of other than expert testimony or common knowledge. Our Supreme Court has characterized the rule of those cases in the following terms: "Thus we recognized in *Quintal* that proof that when due care is exercised an injury rarely occurs, accompanied by other evidence indicating negligence, may be sufficient to warrant an instruction on conditional res ipsa loquitur. [Citation.] This is particularly true where, as in *Quintal* and in the present case, the injury occurred as the result of a normal procedure such as the administration of an anesthetic, rather than from a complex operation." (*Clark* v. *Gibbons,* 66 Cal.2d 399, 412 [58 Cal.Rptr. 125, 426 P.2d 525]; see also *Quintal* v. *Laurel Grove Hospital,* 62 Cal.2d 154 [41 Cal.Rptr. 577, 397 P.2d 161]; *Fraser* v. *Sprague,* 270 Cal.App.2d 736 [76 Cal.Rptr. 37].)

In adopting the proposition that a conditional res ipsa loquitur instruction may sometimes be required in the absence of expert testimony or common knowledge of the requisite condition, our Supreme Court has recognized that the presence of evidence indicating negligence, together with rarity of injury, does not universally trigger the instruction. The rule is not phrased in absolute terms. Rather it states that if the circumstances recited in it are present, the doctrine of conditional res ipsa loquitur *may* be applicable. The rule further emphasizes its applicability to injuries resulting from procedures which are not complex (*Clark* v. *Gibbons, supra,* 66 Cal.2d 399, 412) and that each case must be determined on its own facts. (*Quintal* v. *Laurel Grove Hospital, supra,* 62 Cal.2d 154, 165.)

We have found no guidelines for the application of the rule of *Clark* and *Quintal.* We do not presume to attempt to adopt guidelines here. We do conclude that, in view of the rule of those cases, a conditional res ipsa loquitur instruction is not appropriate in all cases of alleged medical malpractice where evidence of an unusual result is coupled with some evidence of negligence in treatment. The case at bench presents a situation in which the instruction was properly refused.

The surgical procedure which appellant alleges caused his injury was highly complex. The injury of which appellant complains while unusual is nevertheless a possible complication of the procedure. Appellant was informed of the complication before he consented to the operation. The evidence adduced by appellant in support of his contention that the procedure was negligently performed is sketchy. It consists essentially of medical opinion that the perfusion procedure should not have been under-

taken and discrepancies in the respondents' evidence concerning the timing of injection of the chemical agents used in the isolation perfusion and the amount of chemical injected. ▆ A difference of medical opinion concerning the desirability of one particular medical procedure over another does not, however, establish that the determination to use one of the procedures was negligent. (*Meier* v. *Ross General Hospital,* 69 Cal.2d 420, 434 [71 Cal.Rptr. 903, 445 P.2d 519].) The discrepancies in the testimony of respondents' witnesses is adequately explained in the record, particularly in view of the delay of over five years between the time of the operation and the time of trial.

Appellant asserts in his brief that the dosage of chemicals employed in the isolation perfusion was patently excessive. That assertion is unsupported by the record. The record reflects that dosage is to be computed on the basis of "ideal body weight"—the patient's actual weight adjusted to reflect the extent to which he is overweight or underweight. The record is silent with respect to appellant's "ideal body weight."[3] While the medical records refer to an amount of chemical used stated in milligrams, which is excessive, there is a complete explanation that the use of "milligram" was mistaken and should have been "micrograms."

Appellant appears to argue that the rule of *Clark* and *Quintal* should, as a matter of policy, be extended to all situations in which a rare result flows from a medical procedure. That extension by this court would be inappropriate. We do not have the means to determine such matters as the impact of the extension upon the development of progressive medical procedures (see concurring opinions by Chief Justice Traynor and Justice Tobriner in *Clark* v. *Gibbons, supra,* 66 Cal.2d 399, 418, 424), nor do we have the means to determine impact upon the cost of medical services to the public. A change in the present doctrine of conditional res ipsa loquitur should be considered only by a forum possessed of the facilities to determine the full consequences of the change.

▆ There is another and totally different reason supporting the refusal of the trial court to give the conditional res ipsa loquitur instruction requested by appellant. The instruction as proposed refers to matter not in evidence and is overly broad in its scope. The proposed instruction states in part: "Whether the injury is one which ordinarily does not occur in the absence of negligence is to be determined from the evidence presented in this trial by physicians and surgeons called as expert witnesses." Appellant points to no testimony, and we have found none, by a physician

---

[3]The actual notes showing calculation of the dosage used are missing from the hospital records. For a period of time prior to trial, those records were in the unauthorized possession of appellant and his counsel.

or surgeon to the effect that appellant's injury is one which ordinarily does not occur without negligence. The jury would have been misled on the nature of the evidence in the case if the instruction had been given in the form requested.

The instruction proposed by appellant applies to all defendants in the case, including respondent Dr. Gaal. Gaal did not participate in the isolation perfusion and was one of those who recommended against it. The evidence presents no theory on which he could have been found liable on the principle of *respondeat superior*. There being no foundation in expert testimony, common knowledge, or *Quintal* type negligence for the giving of a conditional res ipsa loquitur instruction as to Gaal, appellant's requested instruction was clearly inapplicable to him.

The trial judge is under no duty to correct or tailor an erroneous instruction requested by a party. He properly may refuse such an instruction. The general rule is applicable where a proposed conditional res ipsa loquitur instruction seeks to sweep within its scope a defendant to whom the doctrine is not applicable although it may be applicable to other defendants in the lawsuit. (*Williams* v. *Cole,* 181 Cal.App.2d 70, 73 [5 Cal.Rptr. 24].)

### *Other Jury Instructions*

Appellant contends that the trial court committed prejudicial error in refusing 12 of the jury instructions requested by him, in modifying three others, and in giving four instructions requested by respondents.

Appellant's brief limits its argument in support of the contention that the refused instructions should have been given to the statement that he was "clearly entitled to them" in view of his theory of the case, i.e., that the isolation perfusion was experimental in character. Appellant's brief ignores the instructions that were given by the trial court. Our review of those instructions leads us to the conclusion that the theory of appellant's case was adequately and clearly given to the jury.

Appellant complains that an instruction proposed by him with respect to the manner of obtaining informed consent to an experimental surgical procedure was modified by the court to encompass consent to a "new or experimental" procedure. The modification was, if anything, helpful to appellant's cause since it imposed a broader obligation upon respondents than did the proposed instruction. True the modification tended to dilute the potential inflammatory effect upon the jury of the use of the term "experimental." A plaintiff in a malpractice action, however, has no vested right to appeal to passion or prejudice.

Appellant contends that there is no evidence in the record to support an instruction given by the court to the effect that a doctor is not liable for any injury proximately resulting from the failure of a patient to follow reasonable advice and instruction. The contention is without merit. Appellant sought damages for limitation in motion of his arm, a condition that could well have resulted from the removal of the large tumor. He had refused advice to exercise the arm and to receive physical therapy.

Appellant's other contentions that error was committed in the jury instructions are essentially unsupported by argument and are either contrary to the law or to the record.

## Fair Trial

Appellant contends that rulings and comments of the trial judge denied him a fair trial. His brief does not discuss the basis for the contention but is limited to transcript references. In view of appellant's failure to discuss the manner in which he is alleged to have been denied a fair trial, his contention must be rejected. We note, also, that our examination of the entire record, including the portions to which reference is made in appellant's brief, discloses no unfairness.

Appellant appears to be complaining of rulings of the trial judge which are correct as matters of law and admonitions which are justified by the record. For example, appellant's counsel complains that he was admonished not to misquote the record. Our examination indicates that the admonition was proper. It also seems to have been ineffective. In his brief on appeal, appellant's counsel refers to the critical tumor as nonmalignant while all the evidence, including his own, is to the contrary. In a portion of his brief in which he accuses respondents' counsel of misconduct, he states that they "had coffee" with juror Pruden. Appellant's evidence shows at most that counsel for respondents had coffee in the same cafeteria (but not at or near the same table) with Pruden after being near him in the cafeteria line.

## Motion for New Trial

After judgment was entered, appellant moved for a new trial on a variety of grounds, including misconduct of respondents' counsel and misconduct of a juror. His motion was denied. His brief on appeal asserts that the trial court erred in denying the motion. The brief limits its argument to the contentions of misconduct of counsel and the juror.

*Misconduct of Counsel.* Appellant submitted affidavits in sup-

port of his motion for a new trial purporting to evidence misconduct of defense counsel. Those affidavits alleged that during the trial some of respondents' counsel conversed with J. Leo Pruden, a juror. Respondents presented testimony directly to the contrary. It was the province of the trial court to resolve the conflict in the evidence so created. Its determination that no improper conversation occurred is supported by substantial evidence and cannot be disturbed by us on appeal.

*Evidence of Juror Misconduct.* Juror J. Leo Pruden, at the time of trial, was a retired dentist engaged in ranching and investment planning. When asked his occupation on *voir dire,* he did not mention that he had once been a dentist. He was never directly asked concerning any past occupation. When queried whether any member of his family or any close friend was a member of the medical profession, Pruden replied, "Oh, I know a lot of men in the medical profession." After the trial had been in progress about three weeks, counsel for one of the respondents discovered Pruden's past occupation. He immediately called the matter to the attention of the trial judge and of appellant's counsel. Appellant moved to have Pruden removed as a juror and replaced by an alternate. The motion was denied by the trial court.

Appellant's motion for a new trial asserts that Pruden concealed a bias when examined on *voir dire.* Appellant filed several affidavits in support of his claim. Two of the affidavits are those of his counsel and contain no competent factual statements bearing upon bias. The affidavits of jurors Claire S. Hanlon, John Lietzow, Linda Miller, Harry Conviser, and alternate juror Dee Croxton contain both general and specific statements bearing upon the issue.[4]

Those affidavits state that at times not specified (and hence conceivably after the verdict had been rendered) Pruden made the following statements. When asked why he had not told anyone that he had practiced dentistry, Pruden replied that he had truthfully answered all questions put to him. He also said, "If I had disclosed the fact that I was a dentist they never would have let me serve." Pruden told Mrs. Hanlon that her notes would not do her any good and said, "They're never going to convince me that they didn't save the man's life." He also stated, "I've been in surgery many times and I know a lot more about it than you do." Pruden told Lietzow that "it didn't make any difference what kind of

---

[4]We recite the detail of appellant's affidavits in the interest of a complete statement of facts. Our recitation is not intended as a direction to the trial court on rehearing to consider any recited item that may relate to subjective matter, be a conclusion, or be otherwise inadmissible, or as an indication that any particular weight should be given any matter, either included in our summary or excluded from it.

tumor it was, that it was cancer and would cause the death of plaintiff if they hadn't done the perfusion." He told Lietzow that early in the trial he had made up his mind to decide the case against appellant.

The juror affidavits also refer to conduct and statements of Pruden allegedly occurring during the course of the trial. He expressed his opinion "about something relating to the case" to Mrs. Hanlon who replied, "You can't call yourself a fair and impartial juror." Pruden answered, "I admire you for saying it, but nobody is ever going to change my mind." Pruden told the jurors not to call him "Doctor" because if it were discovered that he was a doctor, he would be put off the jury. He gave Lietzow his interpretation of "some of the medical terms and some of the medical problems that were discussed by the witnesses" stating that he knew the medical terms because of his experience in surgery as a dentist. Pruden discussed other testimony. At a recess, he told Lietzow that appellant was not entitled to recover anything because the doctors at U.C.L.A. had saved his life. When appellant was testifying with respect to the disappearance of hospital records, Pruden stated aloud, "He's nothing but a damn thief." He made a similar comment concerning appellant's counsel when the latter also testified concerning the records. At another point in appellant's testimony, Pruden said, "That guy doesn't know up from down." He stated in reference to testimony by a defense witness, "I've been waiting many weeks to hear this evidence." At a time when appellant exposed his injured hand, Pruden stated, "Stop waving that thing around in the air." Shortly before closing argument, Pruden said to Miller, "Unless we bring in family pictures and talk about them, it won't take more than five minutes to decide this case." While appellant's counsel was arguing the subject of damages, Pruden said aloud but to no one in particular, "I'll give him a dollar and a bottle of arsenic."

During jury deliberations, Pruden "was the leading advocate for the defense." From "the very outset of deliberations" he expressed his opinion that appellant should not recover. He "persisted in arguing not according to the facts of the case but by advising jurors of his medical knowledge and training." Pruden argued "that as a medical man he knew defendants had saved the plaintiff's life and that plaintiff wasn't entitled to damages." He brushed aside evidence called to his attention and "whenever any medical question came up he referred to his own experience and told the jurors he had been in surgery many times." Pruden stated that the thrombosis suffered by appellant could not have been caused by the chemicals injected because of the delay in its appearance. He interpreted the Gardena hospital records to the jury.

The original jury vote was three for appellant, three for respondents, and six undecided. The jurors "were obviously persuaded by Dr. Pruden and by

his claims to have superior medical knowledge." The ultimate jury vote was nine to three for respondents.

Respondents sought to produce declarations countering the affidavits filed by appellant with respect to Pruden's alleged misconduct as a juror. The trial court refused to receive those declarations. It denied appellant's motion for a new trial.

*Law at Time of Hearing.* At the time of the trial of the case at bench and the hearing on appellant's motion for a new trial, testimony of a juror was admissible to impeach a jury verdict only if that testimony tended to establish: (1) that the verdict was arrived at as the result of chance; (2) that a juror concealed bias or prejudice on *voir dire* examination; (3) that a juror was mentally incompetent at the time of trial; or (4) that a juror did not intend to follow the court's instructions on the law and had concealed that intention on *voir dire*. Affidavits or other testimony of a juror was not admissible to impeach a jury verdict for any other reason. (*People* v. *Hutchinson,* 71 Cal.2d 347, 346-348 [78 Cal.Rptr. 196, 455 P.2d 132].)

Appellant's theory in the hearing before the trial court on his motion for a new trial was that the affidavits filed by him disclosed a bias of juror Pruden concealed by him on *voir dire* examination. His counsel expressly so stated in response to a motion made by respondents to strike the juror affidavits upon the ground that they violated the then general rule that juror evidence was not competent to impeach a jury verdict. Appellant's counsel, in arguing the motion for a new trial, said that the significance of the juror affidavits lay in their support of an inference that Pruden had been biased when questioned as a prospective juror on *voir dire*.

Tested by the law as it existed at the time the motion for a new trial was heard and considered in the context of appellant's theory of the case at that time, the determination of the trial court denying the motion finds adequate support in the record. Pruden was not asked on *voir dire* concerning any past occupations. The trial court thus could properly have concluded that he did not give an untruthful answer on *voir dire*. (See *MacColl* v. *Los Angeles Metropolitan Transit Authority,* 239 Cal.App.2d 302, 306 [48 Cal.Rptr. 662].) While the affidavits filed by appellant indicate that by the conclusion of the proceedings Pruden may have acquired a bias against appellant's position in the trial, they do not establish as a matter of law that he possessed it when he was examined as a juror. The trial court was thus free to draw the inference that Pruden had not concealed a bias or prejudice on *voir dire*.

*Change in the Law.* After appellant's motion for a new trial had been

determined adversely to him and while this appeal was pending, our Supreme Court reversed the former law of California with respect to the use of juror testimony to impeach a verdict. It held in *People* v. *Hutchinson,* 71 Cal.2d 342 [78 Cal.Rptr. 196, 455 P.2d 132], that an affidavit of a juror stating that the court bailiff had improperly pressured the jury to reach a verdict in a criminal case was admissible to impeach the verdict. In reaching its decision, our Supreme Court did not limit its statement of the new California law to the facts of the case before it. Rather, it stated: "We therefore hold that jurors are competent witnesses to prove objective facts to impeach a verdict under section 1150 of the Evidence Code. To the extent that *Sopp* v. *Smith,* . . . 59 Cal.2d 12 [27 Cal.Rptr. 593, 377 P.2d 649], *Kollert* v. *Cundiff,* . . . 50 Cal.2d 768 [329 P.2d 897], and similar cases are contrary to our conclusion herein, they are overruled." (*People* v. *Hutchinson, supra,* 71 Cal.2d 342, 351.)

The affidavits of jurors in the case at bench contain evidence considered competent by the rule of *People* v. *Hutchinson* and material to a ground for a motion for new trial which, at the time of hearing on the motion, the parties were barred from presenting and the trial court was precluded from considering by the law as it then existed. The increased scope of consideration to be given juror affidavits as mandated by *Hutchinson* would require a determination not only of the issue of Pruden's allegedly concealed bias but also of his possible misconduct while serving on the jury. For example, the affidavit of juror Lietzow declares that Pruden stated that he had made up his mind that appellant was not entitled to anything prior to the time that the case was submitted to the jury. (*Deward* v. *Clough,* 245 Cal.App.2d 439, 443 [54 Cal.Rptr. 68].) The affidavits also state other facts of possible misconduct. While the facts are by no means conclusive that a new trial should be granted if the evidentiary principle of *Hutchinson* is applied to the proceedings at bench, they do indicate that the trial court might have reached a different result if *Hutchinson* had been decided prior to the critical hearing.

### *Disposition of Case on Appeal*

Our examination of the record of the case at bench and the controlling authority leads us to the conclusion that, except for appellant's contention that the denial of his motion for a new trial was improper, his position on appeal is not supported. Appellant's argument that he was entitled to a favorable ruling on his motion for a new trial has, however, been vitally affected by *People* v. *Hutchinson, supra,* decided while this appeal was pending. The problem remains concerning the effect of that case upon the disposition of the appeal at bench.

Three options are potentially open to us: (1) we might affirm the judgment upon the basis that appellant is not entitled to change his theory on appeal from that presented to the trial court; (2) we might reverse the judgment, thus ordering a new trial on all issues; or (3) we might remand the matter to the trial court for rehearing on the motion for a new trial.

The first two options operate in a manner that is grossly unjust to the parties. A disposition of the appeal which affirms the judgment because appellant failed to proceed on a theory in the trial court which was not open to him at the time of trial but which has now become part of the law of California unfairly penalizes him for a lack of extrasensory perception. (See *Marsango* v. *Automobile Club of Southern Cal.*, 1 Cal.App.3d 688 [82 Cal.Rptr. 92].) A disposition which orders a new trial on all issues similarly penalizes respondents for not presenting evidence on the motion for new trial bearing upon a theory not asserted by appellant and which could not properly have been considered by the trial court at the time of hearing on the motion.

The third option, that of remanding the matter for a rehearing on the motion for a new trial, is that which is the only process calculated to lead to a fair result. We conclude that we have the power to order such a remand in the narrow circumstances of this case.

We are cognizant of the proposition that the strict statutory time limits upon the various steps incident to hearing and action upon motions for a new trial greatly inhibit appellate action remanding a matter to the trial court for further proceedings on the motion. Where the trial court has failed adequately to specify its reasons for granting a new trial for insufficiency of the evidence pursuant to Code of Civil Procedure section 657, an appellate court is without power to remand the matter for further specification of reasons but must affirm the judgment if it is otherwise correct. (*Mercer* v. *Perez,* 68 Cal.2d 104 [65 Cal.Rptr. 315, 436 P.2d 315].) Where a trial court has failed to act upon a motion for a new trial within the statutory period, the motion is deemed denied and the appellate court cannot revive the power of the trial court to grant the motion. (*Siegal* v. *Superior Court,* 68 Cal.2d 97 [65 Cal.Rptr. 311, 436 P.2d 311].) Division Four of the Court of Appeal for the First District has extended the rule of *Mercer* v. *Perez, supra,* and *Siegal* v. *Superior Court, supra,* to the situation in which the trial judge ruling on the motion for a new trial applies an improper standard in denying the motion. (*Lippold* v. *Hart,* 274 Cal.App.2d 24, 26 [78 Cal.Rptr. 833], hearing denied by Supreme Court Aug. 6, 1969; *Andersen* v. *Howland,* 3 Cal.App.3d 380, 385 [83 Cal.Rptr. 308].)

In *Lippold* and *Andersen*, it held that the reversal of the order of the trial judge denying a new trial required that the case be reversed in its entirety and not remanded for further consideration of the motion on the basis of the proper standard.

It is also clear that the trial court retains power in some circumstances to act with respect to a motion for new trial after an appeal. In *Jehl* v. *Southern Pac. Co.,* 66 Cal.2d 821 [59 Cal.Rptr. 276, 427 P.2d 988], the successful plaintiff in a personal injury action moved for a new trial on the ground that the damages awarded were inadequate. The motion was granted. At the time of the motion, the law of California did not permit additur. Our Supreme Court in *Jehl* adopted the principle of additur. It disposed of the appeal by ordering that the order granting a new trial be affirmed unless the trial court in its discretion ordered additur within 30 days of the receipt of the remittitur and granted the defendant no longer than 30 days thereafter to accept or reject the additur.

*Jehl* v. *Southern Pac. Co., supra,* which holds that the trial court has power to act on a motion for new trial after an appeal, is distinguished from *Mercer, Siegal, Lippold,* and *Andersen* by the fact that, in *Jehl,* the governing law changed from the time of hearing on the motion for new trial to the determination of the appeal. That fact also distinguishes the case at bench from those decisions. The case at bench is further distinguished from *Mercer* and *Siegal* by the fact that here the trial court acted on the motion for a new trial within the statutory period thus ripening its exercise of jurisdiction. The case at bench is distinguished from *Lippold* and *Andersen* by the fact that here the action of the trial court applied a standard proper under the law as it then existed. In *Lippold* and *Andersen,* the appellate court appears to conclude that the action of the trial court purporting to exercise its jurisdiction within the statutory period was so patently erroneous as to be no exercise of jurisdiction at all. We conclude that the case at bench is governed by the principle of *Jehl* v. *Southern Pac. Co.* and that it may, therefore, properly be remanded to the trial court for further proceedings on appellant's motion for a new trial. (See *People* v. *Robarge,* 41 Cal.2d 628, 635 [262 P.2d 14]; *People* v. *Hutchinson,* 71 Cal.2d 342, 351 [78 Cal.Rptr. 196, 455 P.2d 132].)

A determination to remand the matter to the trial court for rehearing of the motion for new trial raises an additional problem. Code of Civil Procedure section 659a contains strict time limits for the filing of affidavits and counteraffidavits with respect to such motions. Those time limits are now long past. They are, however, not jurisdictional. (See Witkin, Cal. Procedure (1954) Attack on Judgment in Trial Court, § 27, and cases

there cited.) A rehearing without the opportunity to present evidence in light of the law as changed after the original hearing and pending appeal would be an idle proceeding. We conclude, therefore, that under the narrow and peculiar circumstances of this case there is an inherent judicial power incident to the appellate process to permit the filing of affidavits and counteraffidavits after the remittitur and before rehearing on the motion.

## Conclusion

The order denying appellant's motion for a new trial is vacated with instructions to the trial court to conduct a new hearing upon appellant's motion for a new trial in accord with *People* v. *Hutchinson, supra,* and with this opinion.[5] The trial court shall specify time limits no longer than those provided in Code of Civil Procedure section 659a for the filing of affidavits and counteraffidavits with respect to the motion. Ruling upon the rehearing shall be made within 60 days of the return of the remittitur to the trial court. Each party to bear his own costs on appeal.

Wood, P. J., and Gustafson, J., concurred.

A petition for a rehearing was denied June 18, 1970, and appellant's petition for a hearing by the Supreme Court was denied July 22, 1970.

---

[5]We, of course, express no opinion as to whether the motion should be granted or denied.