[No. B217011. Second Dist., Div. Eight. Aug. 16, 2011.]

KATHERINE BARRESE, Plaintiff and Respondent, v.
JACQUES GASTON MURRAY, Defendant and Appellant.

## COUNSEL

Horvitz & Levy, Lisa Perrochet, John A. Taylor, Jr., Katherine Perkins Ross, Karen M. Bray; Garrard & Davis, Steven D. Davis; and Ronald J. Seeley for Defendant and Appellant.

Steptoe & Johnson, Bennett Evan Cooper, Michael P. McNamara, Kirsten Hicks Spira and J. Patrick Jacobs for Plaintiff and Respondent.

## OPINION

**FLIER, J.**—Respondent Katherine Barrese sued appellant Jacques Gaston Murray under the authority of *Marvin v. Marvin* (1976) 18 Cal.3d 660 [134 Cal.Rptr. 815, 557 P.2d 106] (*Marvin*) and was awarded $5.7 million by a jury. Although the trial court stated in the hearing on appellant's motion for new trial that respondent could not be believed, the court denied the motion because it concluded that it did not have the power to set aside the jury's verdict.

On April 18, 2011, we filed an unpublished opinion (B217011) in which we held that the trial court erred when it ruled that it did not have the power to set aside the verdict. We remanded with directions to rehear and determine appellant's motion for a new trial in accordance with the principles set forth in the opinion.

Both sides filed petitions for rehearing. We granted the petition filed by appellant because it appeared that there was a substantial question whether the trial court could hear and determine the motion for new trial. The obstacle appeared to be the 60-day time limit, measured from the mailing of the notice

of entry of judgment, on the trial court's power to rule on the motion for new trial. (Code Civ. Proc., § 660 (section 660).)[1] We denied the petition filed by respondent.

█ We afforded an opportunity to both parties to brief this issue and the parties did so. After considering the views and authorities propounded by the parties, we conclude that the 60-day time limitation does not apply and that the trial court does have the power to hear and determine, on the merits, the motion for a new trial.

We reiterate the opinion previously filed and add, in a new part, a discussion of the point upon which we granted a rehearing.

## FACTS

Appellant, age 90 in 2010, describes himself as a successful and wealthy international businessman; he is still active as the chairman of a major company that is publicly traded on the London Stock Exchange. He owns homes in 12 cities, including London, Geneva, Paris, St. Tropez, Acapulco, New York, Miami and Beverly Hills.

Respondent and appellant met in St. Tropez in 1984 where respondent had her first movie role as an actress in a Jerry Lewis movie; respondent was 23 and appellant was 64. The occasion was a lunch at appellant's house to which he had invited the movie crew. Respondent states that appellant began to pursue her aggressively, while appellant characterizes the relationship as keeping in touch.

Appellant, thrice divorced, told his lawyer after the final divorce that he would never remarry. This is the lawyer's account of the unusual response that appellant devised for his divorces: " 'I decided that I would never remarry or that I would never become emotionally involved again, and my way of solving or living with that decision is to have a number of girls that are going to be escorts or companion[s] or girlfriends that I will compensate. I will pay them, and I want a number of them because I want to make sure that no one, none of them is going to take an important role in my life, in my house, give instructions to anyone, and when I will feel, and when I have felt in the past,' because this was ongoing when he [(appellant)] told me [(the lawyer)] this, 'it was already ongoing for several years, that someone feels that she is becoming important or too important in my life, I will just nicely give her a return ticket and tell her we spent a month together and have someone else come.' "

---

[1] If no notice of entry of judgment is given, the time begins to run from the filing of the first notice of intention to move for a new trial. (§ 660.)

Appellant has had at least a dozen paid companions over the last 25 years; some of these relationships were long, ranging from 10 to 30 years. He traveled with his companions and they accompanied him to social engagements, lunches, dinners and private parties. Appellant paid his companions by the day plus expenses; as an example, he paid one companion (not respondent) $1,000 per day and another 2,000 Euros per week. Some were paid a portion of their daily rate even when they were not with appellant; appellant's counsel writes in the opening brief that this was "essentially a retainer."

Companions changed frequently. A family friend who grew up with one of appellant's sons and spent every summer at the St. Tropez house until he was 18 testified that "there might be two or three ladies that might come and go in a period of two, three weeks, five, six weeks." A personal assistant testified that one companion would leave one day and the next one would arrive the same day. As to how frequently this happened, the assistant stated that "in one month it could happen twice." Appellant's daughter-in-law testified that she saw companions change 50 times in 10 years. Travel arrangements for these entries and exits by the companions were made by appellant's personal staff.

The next time that appellant and respondent met after St. Tropez was in late 1987 or early 1988. The place was Los Angeles where respondent had moved as part of her movie career. According to respondent, after "about four months, she became his girlfriend. He told her that he loved her." As appellant puts it, appellant and respondent "generally agree that they often spent time together between 1988 and 2007." Appellant conceded that he probably spent more time with respondent than with the other companions. Appellant and respondent traveled together and were accompanied on these trips by respondent's young daughter Sasha. At appellant's request, respondent hired a full-time nanny for Sasha so that respondent could travel with appellant with or without Sasha.[2]

All the same, appellant's travel records between 2002 and 2007 showed that in addition to respondent, he traveled with six of his other paid companions.

According to respondent, appellant repeatedly promised her that he would take care of her no matter what happened. That is, he promised that even if they broke up or something happened to him, respondent would be taken care of. Although appellant denied making such a promise, he conceded that in 2006 he directed his trust to pay respondent, upon his death, $10,000 per month indexed for inflation for her lifetime. We are told that he has rescinded this directive.

---

[2] Appellant took a real interest in Sasha, selecting and paying for her boarding schools.

The evidence is that respondent was fully aware of appellant's other companions and of the arrangements between appellant and these women. Respondent spent time with some of these companions and they discussed their roles in appellant's life.

Appellant and respondent had a sexual relationship between 1988 and 1992, but not afterwards. According to respondent, between 1988 and 1992 they had sexual relations "a few times." Appellant had undergone prostate surgery before he met respondent and he testified that his interest in sex declined over the years. He stressed at trial that what he sought from respondent was companionship and not sex.

Appellant and respondent acknowledged that they felt genuine affection for each other, both characterizing these feelings as love. On her part, respondent wished to be a partner and helpmate, and appellant called her charming and enchanting.

The services that respondent provided ranged from practical nurse to personal assistant. She monitored, ordered and carried appellant's medications and vitamins. Respondent kept track of appellant's doctors around the world and made sure that he had his annual checkups. She wrapped wet napkins around his neck, forehead, etc., to prevent him from overheating in the summer. She purchased a portable urinal that was kept next to the bed, which she would empty in the morning. She took him to the dentist, wellness centers and hospitals and to doctor's appointments; she made his doctor's appointments. At the doctor's office, she filled out the paperwork and remained in the room while he was being examined and treated. She stayed with him when he was hospitalized; she once slept on the floor of the hospital room in St. Tropez because he wanted her there.

Respondent acted as a personal assistant or secretary in business matters. She placed his calls, faxed documents for him and sent and received messages. She accompanied him on business trips involving real estate purchases and development projects.

Appellant and respondent also spent purely social time together, whether just the two of them over breakfast, as an example, or in the company of others. They discussed events and people, played chess and enjoyed movies together. Respondent planned their social gatherings and events and issued the invitations.

Respondent acknowledged at trial that after 1992 she had sexual relations with 10 men over the years prior to 2007. She did not think that this was inconsistent with her relationship with appellant. For one, appellant told her

that after his prostate operation he was not interested in sex and it was not an important part of his life. Also, her sexual relations with other men she characterized as "really discrete and very private." And she did not let these sexual liaisons get in the way of her relationship with appellant, which was her main priority. As far as appellant was concerned, he testified at trial that respondent was not "allowed" to go out with other men when she was with appellant, but when she was not with him, it was "all right."

Respondent resided at various locations during her years with appellant. She had an apartment in Brentwood from 1988 to 1991. Thereafter she stayed for a time at appellant's home on North Beverly Drive in Beverly Hills. But, according to one of appellant's personal assistants, she did not live there full time and did not live there when appellant was not there. Another personal assistant called respondent a guest at the Beverly Hills home and testified that "she was not living in the house at all." According to this assistant, between 1989 and 1999 her direct instructions from appellant were that respondent "was just a guest and nothing was to be moved in the house, and nothing moved away." That is, respondent was not allowed to move furniture or redecorate any part of the house.

In 1996, respondent leased an apartment on Robbins Avenue in Beverly Hills. Although respondent claimed that this was for Sasha, the girl was only 15 at the time. Respondent's friends visited her at this apartment, the building owner saw her frequently and she used this address on her personal stationery.

With funds supplied by appellant, respondent bought a house in West Hollywood, California, in 2005 for $1.5 million, using the Robbins Avenue address on her mortgage application. Respondent entertained friends and family at this house.

Finally, appellant was respondent's sole source of income between 1988 and 2007. Beginning a few months after their relationship commenced, appellant started paying respondent approximately $10,000 a month. These monthly payments increased over time so that by 2007 the monthly sums averaged between $30,000 and $40,000. Thus, in 2006 respondent received $432,880 and up to August 2007 she got $305,627 from appellant.[3] Although respondent tried to portray these payments as an "allowance," the fact of the matter is that appellant ended up paying $10,000 per week when respondent was with him and $10,000 a month when she was not. Records kept by respondent herself show that the payments were correlated to the time she spent with appellant.

---

[3] In 1995, appellant promised to give respondent certain stock in Andrews Sykes Group plc, one of appellant's companies, or its cash equivalent of $260,000 if she was still with him in July 1996. When the time came, respondent opted for the cash equivalent.

The relationship ended where it began, in St. Tropez, in the summer of 2007 because respondent felt that appellant was becoming increasingly irascible. She finally complained to him that he was treating her unfairly and she left St. Tropez. She filed this action in December 2007.

## RESPONDENT'S ACTION, THE JURY
## INSTRUCTIONS AND THE VERDICT

Respondent advanced four monetary claims against appellant, which she alleged were founded on appellant's express promises. These claims were (1) support at the rate of at least $10,000 per month; (2) $100,000 worth of stock in Andrews Sykes Group PLC (see fn. 3, *ante*), annually between 1996 and 2007; (3) four condominium units in a hotel in Miami built by appellant; and (4) sufficient funds to pay the mortgage, taxes and upkeep on her West Hollywood home.

Opening statements commenced on February 24, 2009. The case went to the jury on March 4, 2009, and the verdict was returned on March 6, 2009.

The special verdict form was divided into four parts, each being denominated as "The [First etc.] Alleged Contract." The four contracts set forth were the four claims we have set forth above.

Each of the contracts contained eight identical questions the jury was required to answer with a yes or no. Because the actual verdict was somewhat nuanced, we set forth the eight questions in the margin.[4] The first three questions are drawn from CACI No. 302 (contract formation) and the remaining questions are based on CACI No. 303 (breach of contract).

The first contract was the promise of support. Here the jury answered all eight questions with yes. It awarded $364,000 for past economic loss and $5.3 million for future economic loss. Based on calculations provided by respondent's economist, the verdict for future damages translates roughly into a payment of $20,000 per month.

The second contract was the promise of Andrews Sykes Group plc stock. The jury answered the first three questions with yes but answered the fourth

---

[4] (1) "Were the contract terms clear enough so that the parties could understand what each was required to do?" (2) "Did the parties agree to give each other something of value?" (3) "Did the parties agree to the terms of the contract?" (4) "Did Ms. Barrese do all, or substantially all, of the significant things that the contract required her to do?" (5) "Did all the conditions occur that were required for Mr. Murray's performance?" (6) "Did Mr. Murray fail to do something that the contract required him to do?" (7) "Was Ms. Barrese harmed by that failure?" (8) "What are Ms. Barrese's damages?"

question with no, which meant that it found against respondent on this claim. The third and fourth contracts were, respectively, the condominiums in Miami and payments for the West Hollywood house. On both claims the jury answered the first question with no and thus found against respondent on these claims.

The facts that favored appellant on the three claims that the jury rejected were as follows. According to appellant and his son, after respondent received the cash equivalent of $260,000, she disappeared for a while; thus, the contention was that she did not remain continuously available for appellant and was therefore not entitled to further stock. The project in Miami was converted into a hotel and all condominiums were cancelled. As far as the West Hollywood house was concerned, appellant denied that he promised to pay all expenses connected with this residence.

## THE MOTION FOR A NEW TRIAL

Having contended throughout that this is not a *Marvin*-type case, appellant's motion for a new trial contended that the jury instruction on respondent's *Marvin* theory was defective and inapplicable. Appellant's motion for a new trial also contended at length that respondent could not be believed and that appellant had not promised to support respondent for life.

This was the trial court's reaction to the question whether respondent could be believed when she stated that appellant promised her lifetime support: "I [(the trial court)] can say that my view was that she was impeached very thoroughly by the cards[5] and other evidence, and it seems to me that there is a little bit of element of the jurors that apparently did not like his status as a wealthy man. It didn't help that he didn't show up on the first day. I don't believe that I can overrule the 9 jurors that did believe it. It is a credibility contest. [¶] My reading of the 13th juror issue relates to cases involving excessive awards. I don't know whether or not, and I don't believe that the case law supports the fact that there is a 13th juror and if I don't agree with 9, I can throw them out, or if I agree with the 3 that came the other way."

The court continued in the same vein, emphasizing that the issue was respondent's credibility and, significantly, went on to state that "if I was the trier of fact that would be a different verdict, but I don't think that is the standard that I can impose on them." The trial court did go on to state that "I would invite direction from the appellate court . . . . [¶] . . . I don't see how my position as a 13th juror can throw [the verdict] out, and I invite direction

---

[5] These were cards maintained by respondent that showed that she effectively billed appellant for the time she spent with him.

from a higher court." The court left no doubt how it viewed the evidence: "As indicated, I would not have found that the contract elements were found here, but don't believe that is the standard, and I do invite appellate review." "[T]he jury found the promise, and I don't believe that it is my position to throw out the 9 that found that there was a promise. *I don't think that I have the legal authority to do that.* [¶] So to that extent I think the weight of the evidence does support the jury verdict. It is there. It is a contradiction of just about every basic issue that was presented to them, contradicted by her deposition testimony, no question about it, but just a credibility call, and I don't think that I can step in to a credibility call issue." (Italics added.)

## DISCUSSION

### 1.  *The Power of the Trial Court in Ruling on a Motion for New Trial*

■  The power of a trial judge to set aside a jury's verdict has come in for some strong support in the Court of Appeal. "It is not only the right, but the duty of the trial judge to grant a new trial when, in his opinion, he believes the weight of the evidence to be contrary to the finding of the jury. Trial judges have been commended, rather than condemned, for their actions in granting new trials under these circumstances." (*Tice v. Kaiser Co.* (1951) 102 Cal.App.2d 44, 46 [226 P.2d 624].) "This court has on many occasions commended the trial courts in granting new trials when, in the opinion of the court, sitting as a thirteenth juror, the weight of the evidence appears to be contrary to the jury's determination, particularly where the verdict appears to be excessive. This practice should not be discouraged." (*Norden v. Hartman* (1952) 111 Cal.App.2d 751, 758 [245 P.2d 3].)

■  The powers of a trial court in ruling on a motion for new trial are plenary. The California Supreme Court has held that the trial court, in ruling on a motion for new trial, has the power "to disbelieve witnesses, reweigh the evidence, and draw reasonable inferences therefrom contrary to those of the trier of fact" (*Mercer v. Perez* (1968) 68 Cal.2d 104, 112 [65 Cal.Rptr. 315, 436 P.2d 315]), that the court sits as "an independent trier of fact" (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 933 [148 Cal.Rptr. 389, 582 P.2d 980]) and that it must "independently assess[] the evidence support-ing the verdict" (*People v. Lagunas* (1994) 8 Cal.4th 1030, 1038 [36 Cal.Rptr.2d 67, 884 P.2d 1015]). The trial judge has "to be satisfied that the evidence, as a whole, was sufficient to sustain the verdict; if he was not, it was not only the proper exercise of a legal discretion, but his duty, to grant a new trial." (*People v. Lum Yit* (1890) 83 Cal. 130, 134 [23 P. 228].)

■  Given these principles, it is evident that the trial court was in error when it stated that it did not have the legal authority to set aside the verdict.

The trial court was mistaken when it thought that its power to set aside the verdict was limited to excessive damages. The court was also in error when it stated that it could not overrule credibility determinations of the jury. The cases make it clear that in ruling on the new trial motion the trial court can—and should—consider credibility independently of the jury's conclusions.

In *Lippold v. Hart* (1969) 274 Cal.App.2d 24, 25 [78 Cal.Rptr. 833], a car accident case where Mr. Hart rear-ended Mrs. Lippold, the trial court denied Mrs. Lippold's motion for a new trial even though the trial court "stated that he did not believe some of Mr. Hart's testimony and that the smoothness of that testimony and the ingenuity and persuasiveness of counsel for respondents had led the jury to disbelieve Mrs. Lippold. Although stating that 'an unjust result has occurred,' the trial judge denied a motion for a new trial because 'the jury heard the story. So I've got to abide by it because it was a unanimous verdict.' " The appellate court noted that "where the comments of the trial judge indicate that he misconceived his duty at the hearing on the motion for new trial, an appellate court will not blindly affirm the judgment below because there is some evidence to support it" and concluded that "[t]he trial judge's comments indicate that, although he made an independent evaluation of the evidence, he failed to base his decision on the motion for a new trial upon that evaluation. That was error." (*Id.* at p. 26.)

The case before us is stronger than *Lippold v. Hart* because in this case we have repeated statements by the trial court that, in the court's view, it lacked the authority or power to grant the motion for a new trial; there is no such clear statement in *Lippold v. Hart.* We also have the erroneous statements that its power was limited to excessive verdicts and that it could not overrule credibility determinations of the jury. In short, the trial court was fundamentally mistaken about its powers in ruling on a motion for new trial.

Respondent contends that the trial "court concluded that the overall weight of the evidence supported the finding that [appellant] agreed to provide lifetime support to [respondent]." This is not correct. There was no such ruling. Respondent has seized on a single sentence ("So to that extent I think the weight of the evidence does support the jury verdict") and has cut and spliced from other parts of the ruling that is four pages long in the reporter's transcript in order to support the claim that respondent makes. In reality, when the actual context of the quoted sentence is taken into account, it appears that the court thought that there was evidence that supported the verdict but the court also concluded that there was a great deal of evidence that contradicted the finding of a promise of lifetime support. Be that as it may, it cannot be doubted that the trial court concluded that respondent could

not be believed and that there had not been a promise of lifetime support, as found by the jury. There definitely was no such finding as respondent describes.

Respondent claims that the trial court "did not say that it was without power to reweigh the evidence." But that is exactly what the court said. "[T]he jury found the promise, and I don't believe that it is my position to throw out the 9 that found that there was a promise. *I don't think that I have the legal authority to do that*." (Italics added.)

Citing *Dominguez v. Pantalone* (1989) 212 Cal.App.3d 201 [60 Cal.Rptr. 431], respondent contends that a trial court cannot grant a new trial simply because it disagrees with the verdict. That is correct. The court must determine whether there is sufficient credible evidence to support the verdict (*id.* at p. 215), which is a different proposition from whether the court agrees or disagrees with the verdict. In this case, the court concluded that respondent was not credible, that there was not sufficient credible evidence to support the finding of a promise of lifetime support. The court did far more than simply disagree with the verdict.

We conclude that the judgment must be reversed and the case must be remanded with directions to hear and determine appellant's motion for a new trial guided by the principles set forth in this opinion. Nothing in this opinion should be construed as an indication by this court of the merits, or the lack of merits, of the motion for new trial; this opinion contains no instructions to the trial court as to how it should rule on the motion for new trial.

2. *The 60-day Limitation on the Trial Court's Power to Rule on the Motion for a New Trial*

We begin with the challenging proposition that the 60-day time limit is jurisdictional. (*La Manna v. Stewart* (1975) 13 Cal.3d 413, 419, fn. 3 [118 Cal.Rptr. 761, 530 P.2d 1073].) At least three decisions of the Court of Appeal have concluded from this that where, as here, the appellate court decides that the trial court erred in ruling on a motion for new trial, the case cannot be remanded for a new ruling by the trial court on that motion. These decisions are *Lippold v. Hart, supra,* 274 Cal.App.2d 24, *Andersen v. Howland* (1970) 3 Cal.App.3d 380 [83 Cal.Rptr. 308], and *Delos v. Farmers Group, Inc.* (1979) 93 Cal.App.3d 642 [155 Cal.Rptr. 843]. The first two decisions are particularly compelling since both involved the same issue as this case in that the appellate courts held that the trial courts erred in ruling that they had no power to set aside the jury verdicts. In *Delos v. Farmers Group, Inc.,* the appellate court concluded that the trial court could not order an increase in the remitted amount following a remand of the case after the appeal because

of the expiration of the time limits of section 660. (*Delos v. Farmers Group, Inc., supra,* at pp. 667–668.) For ease of reference, we will refer to these three cases collectively as the "trio of cases."

■ It must be conceded that this trio of cases is inspired by an unforgiving, if also unbending, logic. After all, section 660 plainly says that after the lapse of 60 days "the power of the court to rule on a motion for a new trial shall expire . . . ." One would think that it could hardly be made more plain that the 60-day rule is in fact jurisdictional.

On the other hand, it is also true that section 660 is predicated on the assumption that a trial has just taken place. The entire machinery of this statute assumes the recent entry of a judgment.[6] But this case is, *at this point*, far removed on the procedural continuum from the entry of judgment, as indeed was also the case when the appellate decisions were filed in the trio of cases. Within the actual procedural context of section 660, the 60-day time limitation is no mystery. Simply put, trial courts should promptly dispose of cases where judgments have been entered; there is no value in dragging out a case where a result has been obtained. Thus, in the context in which section 660 was designed to operate, the 60-day limitation makes good sense.

■ But we do not write this opinion, or decide this appeal, with a judgment just having been entered. That event cannot help being a distant occurrence, even if the appeal has proceeded expeditiously. "The rules of statutory construction teach us that courts should ascertain the Legislature's intent so as to effect the purpose of the law in question. In fulfilling this rule, we look first to the language of the statute itself, considering that language in the context of the entire statute and statutory scheme." (*Slocum v. State Bd. of Equalization* (2005) 134 Cal.App.4th 969, 976 [36 Cal.Rptr.3d 627].) The context or setting of section 660 is a case where a trial has just been concluded. Section 660 was meant to govern the disposition of motions for new trial that have been brought under Code of Civil Procedure section 659, i.e., at most within 180 days after the entry of judgment if there was no notice of entry of judgment.[7]

---

[6] "Except as otherwise provided in Section 12a of this code, the power of the court to rule on a motion for a new trial shall expire 60 days from and after the mailing of notice of entry of judgment by the clerk of the court pursuant to Section 664.5 or 60 days from and after service on the moving party by any party of written notice of the entry of the judgment, whichever is earlier, or if such notice has not theretofore been given, then 60 days after filing of the first notice of intention to move for a new trial." (§ 660.)

[7] A motion for new trial must be made: "1. Before the entry of judgment; or [¶] 2. Within 15 days of the date of mailing notice of entry of judgment by the clerk of the court pursuant to Section 664.5, or service upon him by any party of written notice of entry of judgment, or within 180 days after the entry of judgment, whichever is earliest; provided, that upon the filing of the first notice of intention to move for a new trial by a party, each other party shall

Section 660 cannot have any application to proceedings on a motion for new trial that take place after the conclusion of the appeal and upon remand of the case to the trial court by the appellate court. None of its provisions suggests that it applies in the context in which this case finds itself at this point in time.

We agree with respondent that it is a matter of considerable weight that the California Supreme Court has on at least three occasions set aside rulings on new trial motions and remanded with directions to the trial court to rehear and determine the motions. (*Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798, 824–825 [111 Cal.Rptr.2d 87, 29 P.3d 175]; *Krouse v. Graham* (1977) 19 Cal.3d 59, 83 [137 Cal.Rptr. 863, 562 P.2d 1022]; *People v. Robarge* (1953) 41 Cal.2d 628, 635 [262 P.2d 14].) It is also no small matter that the Court of Appeal has followed the same practice in a number of cases. The following decisions are illustrative. (E.g., *StreetScenes v. ITC Entertainment Group, Inc.* (2002) 103 Cal.App.4th 233, 245–246 [126 Cal.Rptr.2d 754]; *Teitel v. First Los Angeles Bank* (1991) 231 Cal.App.3d 1593, 1607 [282 Cal.Rptr. 916]; *Rollins v. City and County of San Francisco* (1974) 37 Cal.App.3d 145, 148–149 [112 Cal.Rptr. 168].) Given that there is solid precedent, our view of the matter does not produce a novel result.

Finally, the remedy applied in the trio of cases, a reversal of the judgment, removes the trial judge from the picture and results of necessity in a new trial. Neither outcome is desirable.

For the sake of completeness, we note that *Clemens v. Regents of University of California* (1970) 8 Cal.App.3d 1, 19–22 [87 Cal.Rptr. 108] (*Clemens*), recognized the problem we have addressed in this opinion and refused to follow the line represented by the trio of cases. Instead, *Clemens* relied on *Jehl v. Southern Pac. Co.* (1967) 66 Cal.2d 821, 835–836 [59 Cal.Rptr. 276, 427 P.2d 988] (*Jehl*), a decision that remanded the case to the trial court with directions to determine, in addressing a motion for a new trial, whether the plaintiff was entitled to an additur.

Appellant is, of course, critical of *Clemens* but the details of that critique need not detain us. *Clemens* did not follow the rationale we have adopted but rather concluded, citing *Jehl*, that "the trial court retains power in some circumstances to act with respect to a motion for new trial after an appeal." (*Clemens, supra,* 8 Cal.App.3d at p. 21.) It appears that the "circumstances" the court had in mind was that in *Jehl* the law changed between the time the trial court first granted the motion for a new trial and the new hearing following remand.

---

have 15 days after the service of such notice upon him to file and serve a notice of intention to move for a new trial." (Code Civ. Proc., § 659, subds. 1, 2.)

Respectfully parting company with *Clemens*, we do not think that the matter is as tentative and subtle as that; the point is simply that section 660 does not apply to a hearing on a motion for new trial under the circumstances that are true of this case at this time.

■ We conclude that section 660 was not intended to operate, or apply, in settings where, following an appeal from the judgment, the appellate court remands the case with directions to the trial court to conduct further proceedings on a motion for new trial.

In light of our disposition of this appeal, it is not necessary to address appellant's remaining contentions.

## DISPOSITION

The judgment is reversed and the case is remanded with directions to rehear and determine appellant's motion for a new trial in accordance with the principles set forth in this opinion. Appellant is to recover his costs on appeal.

Rubin, Acting P. J., and Suzukawa, J.,* concurred.

---

*Associate Justice of the Court of Appeal, Second Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.