[Civ. No. 26648. Second Dist., Div. Two. Apr. 24, 1963.]

THOMAS W. BRADFORD, Plaintiff and Appellant, v. BENJAMIN WINTER, Defendant and Respondent.

Pastor & Zipser and David Hoffman for Plaintiff and Appellant.

Overton, Lyman & Prince and Lawrence J. Larson for Defendant and Respondent.

ASHBURN, J.—Plaintiff Thomas W. Bradford appeals from the judgment in favor of defendant Benjamin Winter, rendered by the trial court sitting without a jury. Plaintiff's causes of action are based on alleged malpractice and battery.

Viewing the evidence in the manner most favorable to respondent, as we are required to do (*Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427, 429 [45 P.2d 183]; *Estate of Arstein*, 56 Cal.2d 239, 240 [14 Cal.Rptr. 809, 364 P.2d 33]), the facts appear to be as follows. Plaintiff was referred by Dr. Rood, a general practitioner, to the defendant, a well-qualified and experienced thoracic surgeon. Plaintiff's X-rays which came with him showed a mass in the right lung. Dr. Rood told plaintiff they showed a shadow on the lung and asked that the family come to see him. This they did and Dr. Rood advised them that tests were necessary to determine whether appellant had cancer of the lung. And when he went to the hospital he knew he was going to have a test made. Upon entry he signed an admittance sheet containing the following consent: "I hereby consent to any medical or surgical procedure, including operating and anesthesia which my physician(s) may consider necessary or advisable in the treatment of my case." From examination of the X-rays defendant Winter formed a tentative opinion that appellant had a cancer. The history and examination of the patient reinforced his tentative opinion. Defendant explained to the plaintiff that he wanted to do a bronchoscopy to help diagnose

the lesion and that in any event surgery would probably be necessary to remove all or part of the lung. Defendant told plaintiff that the bronchoscopy consisted of passing a brass tube down the plaintiff's throat so that he could look inside the bronchial tubes to see if he could find anything abnormal *and examine it if he did.* Defendant said the mass was a threat to plaintiff and would have to be investigated and "this satisfied him completely." "If it has to be done, let us get on with it." Plaintiff signed a written consent which is hereinafter quoted.

A biopsy is part of the bronchoscopy when an abnormality is found during bronchoscopy.

The bronchoscope was passed down into the right bronchus. At one point in this area the tissues appeared abnormal, with narrowing of the bronchus extending concentrically around it and indicating that a tumor of some sort outside the bronchus was producing the narrowing. At one point it was indicated that the process had extended into the wall of the bronchus and perhaps the mucosal lining in which there did not appear to be any break.

Respondent decided to take a biopsy of the mucosa and the tissue in the wall of the bronchus just beneath it in order to see if a diagnosis of the disease process could be established by the pathologist.

It was advisable to obtain tissue below the mucosa, since there was no apparent defect in it and if the mucosa was normal a pathological diagnosis could only be established from the tissues beneath it. It was important in appellant's case to establish a diagnosis, if possible.

Accordingly, and at the point where the tissues appeared abnormal, respondent, using biopsy forceps specifically made for the purpose, attempted under direct vision to obtain a biopsy specimen. The point at which the biopsy bite was taken was on the posterior wall at the division of the main stem bronchus into additional bronchi. Respondent took the normal and usual biopsy bite just as he had done in hundreds of other cases without any complication. The bite did not perforate or go through the wall of the bronchus, was definitely within the wall, and was not a deep bite except in the descriptive sense indicating that it was intended to and did go below the mucosal lining, which is paper thin. The bronchial wall at this point is about one-eighth to three-sixteenths of an inch thick.

An unexpected sudden massive hemorrhage immediately

occurred, the hemorrhage coming from a relatively large vessel, probably a pulmonary artery of a size not normally encountered or expected in the bronchial wall, presenting a most unusual and rare situation.

There was no reason for respondent to believe, based upon his experience, that he would encounter at the biopsy site either a pulmonary artery or any other vessel of the size indicated by the type of hemorrhage which occurred. Dr. Prietto, a well-qualified expert, testified in substance that there probably was an anomalous artery pushing into or within the wall of the bronchus at the location of the biopsy, a place where it ordinarily would not be located and which there was no reason to suspect from the findings at bronchoscopy.

By application of adrenalin swabs and pressure through the bronchoscope bleeding into the bronchus was stopped but, because of the danger of a fatal rehemorrhage, an emergency thoracotomy (incision of the wall of the chest) was advisable and in respondent's opinion the only sensible course under the circumstances.

Respondent then told appellant, who was conscious and able to comprehend, that an unexpected severe hemorrhage had occurred, that it was controlled for the time being, but that he thought it was in appellant's best interests to proceed with the surgery previously discussed and appellant agreed.

Because any motion, including that involved in getting appellant to sign the consent to the proposed surgery, might cause fatal hemorrhaging, a nurse was instructed to contact appellant's wife who came to the hospital where the matter was explained to her and she signed the consent to the proposed surgery.

At the surgery, when the right chest was opened, the right lung from its appearance and by palpation and feeling appeared malignant and the disease appeared not only to involve the main pulmonary artery to the lung but to have spread to the pleura. Respondent, in view of these findings, because the lower lobe of the lung had to be removed in any event due to the hemorrhage and because it was not technically possible to remove only the lower and upper lobes leaving the middle lobe, performed a pneumonectomy (excision) of the right lung.

The appellant makes the following arguments: (1) That a technical assault and battery was committed because appel-

lant was not expressly told that a biopsy might be taken and, therefore, respondent did not obtain appellant's consent to the biopsy; (2) that if there was consent to the biopsy, that consent was vitiated because respondent misled appellant and failed in a claimed duty to disclose information to appellant concerning the bronchoscopy and biopsy, but for which appellant would not have consented; (3) that respondent, as a matter of law, was guilty of malpractice.

The trial judge found that there was no negligence on defendant's part and no battery. The ruling was based upon substantially conflicting evidence. Appellant approaches the appeal as if the court of review would reweigh the evidence, saying: "Plaintiff will limit the points on appeal to those wherein there is little or no conflict in the evidence." ▮ Innumerable cases have established that the appellate function has been exhausted when the court ascertains that there is a conflict of substantial evidence upon the controlling issue or issues. (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778]; *Florez* v. *Groom Development Co.,* 53 Cal.2d 347, 354 [1 Cal.Rptr. 840, 348 P.2d 200].)

▮ If the claim be insufficiency of the evidence to support the decision, "[s]uch contention *requires defendants to demonstrate* that there is no substantial evidence to support the challenged findings." (*Nichols* v. *Mitchell,* 32 Cal. 2d 598, 600 [197 P.2d 550].) (Italics added.) See also *New* v. *New,* 148 Cal.App.2d 372, 383 [306 P.2d 987].

▮ "The appellate court starts with the presumption that the evidence sustains each finding of fact [citations], and the burden rests upon appellant 'to demonstrate that there is no substantial evidence to support the challenged findings.' [Citations.] ▮ To this end appellant must set forth in his brief all material evidence upon the point, not merely his own proofs [citations]; if this is not done the point is deemed waived (so held in the cases just cited). ▮ Counsel in this case has made no real effort to comply with the rule. . . . In the circumstances we are entitled to accept the statements of respondent's brief as to the evidence upon the subject. Respondent's counsel has assembled enough of the testimony in his brief to show at least a substantial conflict in the evidence. . . . ▮ We do not make an independent search of the record to uncover error. Our duty with respect to this contention of appellant is now discharged." (*Davis* v. *Lucas,* 180 Cal.App.2d 407, 409-410 [4 Cal.Rptr. 479].) Appellant has not made the required showing at bar.

454

█ The evidence is ample to refute appellant's claim that there was no consent to a biopsy because he had never been told that one would be made. Upon entry into the hospital he signed an admittance sheet containing the consent above quoted. Defendant told appellant before using the broncho-scope that there were many tests that could be made, that this would take place, and that if the investigation turned out to be negative appellant should not consider himself free of the possibility of surgery; that though defendant might do a number of tests and all turn out negative, "we would still be faced with a situation that we could not diagnose except by surgery, and I wanted that understood by him right at the onset." The patient was told that a bronchoscopy was sufficient as the first step; also, "I told him that it would consist of painting his throat up so he didn't feel anything, and then we would pass a brass tube down inside his lung and have a look inside his bronchi, his bronchial tubes to see if we could find anything abnormal, and examine it if we did." He did not tell appellant specifically that he would cut a specimen from his lung. He was told "that there was something going on in his chest, a mass that was a threat to him and that we would have to deal with by surgery, by removing part or all of his lung, and that we would have to investigate it and this satisfied him completely, and I saw no need to dwell on the subject, to frighten him or to upset him in any way. As long as he was content, I certainly was, to proceed." A biopsy is a normal part of a broncho-scopy when an abnormality is found during that examination. The patient then signed the following consent: "I hereby authorize and direct Doctor Winter to perform the following operation upon me Bronchoscopy and to do any other pro-cedure that his or their judgment may dictate."

█ Consent to medical care, including surgery, may be express or may be implied from the circumstances. (*Kritzer* v. *Citron*, 101 Cal.App.2d 33, 38-39 [224 P.2d 808] ; *Wheeler* v. *Barker*, 92 Cal.App.2d 776, 783-784 [208 P.2d 68] ; *Adams* v. *Boyce*, 37 Cal.App.2d 541, 550 [99 P.2d 1044] ; *Di Filippo* v. *Preston*, 53 Del. 539 [173 A.2d 333, 339] ; *Govin* v. *Hunter* (Wyo.) 374 P.2d 421, 423-424.( The second consent signed by appellant plainly embraced the taking of a biopsy, a normal incident of a bronchoscopy. Supporting this view is *Danielson* v. *Roche*, 109 Cal.App.2d 832 [241 P.2d 1028]. The trial court found upon the basis of ample supporting evidence: "Plaintiff consented to the procedures and

surgery performed on him by defendant Winter and, under the circumstances of this case, plaintiff's consent was a full, free and informed consent to the diagnostic procedures to be used and surgery to be performed on him by defendant Winter. Defendant Winter did not commit an assault or battery upon plaintiff.'' Implicit in this finding is a negation of appellant's claim that material facts concerning the contemplated biopsy were suppressed or that for any reason appellant's consent thereto was vitiated.

■ Appellant relies in his argument upon the doctrine of res ipsa loquitur. In determining its applicability to a particular case the judge must consider expert testimony as well as matters commonly known to the layman. (*Seneris* v. *Haas,* 45 Cal.2d 811, 824-825 [291 P.2d 915, 53 A.L.R.2d 124]; *Siverson* v. *Weber,* 57 Cal.2d 834, 836 [22 Cal.Rptr. 337, 372 P.2d 97].)

Defendant testified: ''Q. Can you describe any more accurately, than the way I have just described them, what you expect, the type of vessel you expect to find in the wall of the bronchus at that point? A. Well, the vessels normally encountered are very small in caliber. They may bleed, but the bleeding either stops spontaneously while under direct vision, suction, stop itself; occasionally it is necessary to put down a swab and hold it there for a moment or two, perhaps dip a little adrenalin in, if it is a little more than that, once, but that is about the extent of any bleeding I have ever had that is usual. Q. And was this that occurred in Mr. Bradford anything at all like any prior instances that you are describing, what you might expect in a biopsy of this type? A. No, this was a most unusual and rare situation.''

Plaintiff's expert, Dr. Rouff, testified in response to a hypothetical question that respondent did not conform to accepted standards when he took the biopsy in question under the conditions outlined; ''Q. Now, with reference, Doctor, to the technique employed in the bronchoscopy, what is your opinion with reference to the care taken by the hypothetical surgeon? A. Well, the carrying out of a socalled blind biopsy of the bronchus or almost any tissue, but the bronchus here specifically, is a dangerous procedure and the fact that a serious hemorrhage ensued would prove this point — that either in taking the biopsy, if the biopsy just went through the mucuous membrane and the muscular layer of the bronchus, that a fairly good-sized vessel was cut, either an artery or a vein with a profuse hemor-

rhage, or that conceivably also that the biopsy bite actually penetrated the wall of the bronchus to induce hemorrhage from the vessels in the outer wall and surrounding the bronchus to produce a hemorrhage would enforce the belief that blind biopsies — I must clarify using the word 'blind.' That may not be exactly correct. It is within vision, but there is no definite disruption of the normal anatomy of the tissue at the point at which the biopsy is taken, so the word 'blind' is probably in error.

"I mean that would assume that you just couldn't see what you were doing, but I mean a biopsy of normal-appearing tissue on the surface which in the case which you present, you describe it as bulging, which normally would not be bulging and when a bulge is seen present in the bronchial tree, it means that there is pressure from the outside; so that if there were pressure from the outside, it would in most cases do no good to obtain a biopsy of the lining of the bronchial tube itself unless that pressure from the outside was caused by a growth which had actually penetrated the wall of the bronchus itself."

The trial judge filed a memorandum opinion in which he compared the two experts, Dr. Rouff and defendant's witness, Dr. Prietto, saying: "While comparisons are sometimes odious, nevertheless, in this case they must be made. Surely there can be no question of the eminent qualifications of Dr. Carlos Prietto compared with those of Dr. Rouff, who unfortunately does not have either the background or current experience in the field as demonstrated by Dr. Prietto. The latter is in active practice in all types of thoracic surgery and procedures, and unqualifiedly endorsed the defendant's methods as having conformed to the standard of practice in this community. On the other hand, Dr. Rouff impressed the Court with more of a hindsight opinion, not having in mind the emergencies of the situation that existed in the mind of the operating surgeon."

Dr. Prietto testified in part: "Q. . . . I want you to assume that Dr. W. then attempted, with the biopsy forceps which I am now showing and handing to you, Doctor, to take a biopsy specimen from the posterior wall at the point of bifurcation at which this — immediately above described increased abnormality appeared, and that he intended to and did start to take a biopsy through the mucosa into the wall of the bronchus for the purpose of ultimately submitting it to a pathologist for microscopic study; and that

in his operative record he described it as a small biopsy. . . . Do you have an opinion as to whether or not Dr. W., in this instance, acted in accordance with the degree of care, skill and learning customarily possessed and exercised by reputable thoracic surgeons in this community at that time, and from here on, Doctor, I am going to call that level of conduct 'accepted practice,' so we will shorten it. Do you have an opinion as to whether he acted in accordance with accepted practice as I have just defined it to you in doing a bronchoscopy on this hypothetical patient before doing any other tests? A. I do. Q. What is your opinion in that regard? A. That is accepted practice.''

''Q. . . . First of all, at the point which the question indicates the biopsy was taken, would you normally expect to find any major vessel such as produced the type of hemorrhage described here, at that point, either in the mucosa or in the wall immediately underlying that mucosa? A. No. Q. Can you describe what type of blood vessels ordinarily are found in that area? A. The blood supply for the bronchus is the bronchial artery. That is a small vessel—you might find one or several, and the blood for the mucosa comes from that. Beyond that, you may have the pulmonary artery, the main artery with various branches to the various segments of the lung. Q. Would you ordinarily expect to find, Doctor, the pulmonary artery that you have just described so adjacent to or within, whichever it may be, the wall of the bronchus that it would contraindicate taking a biopsy specimen as indicated in that hypothetical question? A. No. Q. From your knowledge of the lung, from your knowledge of its parts, the blood supply in the area and ordinary locations and from the description in the hypothetical question, Doctor, of the type of hemorrhage which occurred, do you have an opinion as to why a hemorrhage occurred in this particular hypothetical instance? A. I have an opinion. Q. All right, and what is it, Doctor? A. Usually you do not find a major vessel in that area, nonetheless, it is possible that he had an aberrant[1] vessel and pulmonary vascular tree has many aberrancies, what we might call anomalies, and it is possible that an anomalous artery was there which was interrupted.''

''A. The patient can hemorrhage to death and the reason I say that is because I have seen it. Q. All right, sir, what

---

[1]The transcript was corrected at page 726, lines 1-11, by substituting the word aberrant for apparent.

would be the difficulties? Why would it be difficult at that point to accomplish, for example, say, the same result that was accomplished while the bronchoscope was still in initially? A. Because the hemorrhage could be dissecting the tissues of the lung, though you may not see the blood coming out into the bronchus, it could be dissecting around the perivascular tissues and planes and stretching all the tissues and tearing further the artery so that it would be a more extensive hemorrhage which he could not reach through a bronchoscope. Q. And what would be the surgical problem, then, with respect to attempting to control the hemorrhage? Would it be difficult or what, Doctor? A. Well, to control that hemorrhage, you could not do it through the bronchoscope. You would have to do it through a thoracotomy.''

''Q. First of all, do you have an opinion as to whether it was accepted practice in view of the findings which I have just related to you, to form the opinion that there probably was carcinoma of the lung to the extent indicated? A. Yes. Q. And would you give us your opinion and your reasons for it? A. Well, when he apparently opened the chest and saw this mass in the lower lobe extending across the fissure, and he saw multiple white implants, that is adequate to presume that it is a malignancy, because malignancy appear like that. . . . Q. And going to what has perhaps just been suggested, do you have an opinion as to whether it was accepted practice, under the conditions I have outlined to you, to do a complete pneumonectomy as indicated here on this patient? A. Yes.''

''Q. Now, does the pulmonary artery also extend within the bronchus on the inside of the bronchus? A. No. Q. So that if you had a hemorrhage that had venous blood in it, it would have had to come from outside of the bronchus itself, is that correct? A. Yes. Q. So that if this hypothetical surgeon in taking his biopsy had caused this bleeding, the biopsy would have had to have penetrated the wall of the bronchus, isn't that correct? A. Yes, or the artery could have penetrated the wall. Q. In other words, the artery might have been growing into the wall? A. Yes. Q. Now, when you say the artery might have been growing into the wall, would that be a side of the artery? A. Yes. Q. And in what manner would it be growing into the wall? Would it be growing on the outside or actually invading the wall itself? A. It would be pushing from the outside in like this (indicating). Q. Pushing against the wall? A. Yes, perhaps

bulging into it." "Q. Assuming, Doctor, that the hypothetical doctor had felt that these lymph nodes were also carcinoma, wouldn't all of these facts, Doctor, have contraindicated any surgery at all? A. In this hypothetical question? Q. Yes. A. No, sir. Q. And for what reason, Doctor? A. Because the primary reason that he did the thoracotomy or the reason of most importance was the hemorrhage. It was my opinion that that superseded the reason that he had originally scheduled him for surgery, that the incidence of the hemorrhage precluded the other, and the hemorrhage was then the all-important reason at this time, making evidence of probable or possible malignant tissue here secondary."

"A. Yes, usually the arteries are in this area but you can have an aberrant blood vessel and since they have priority, they can erode tissue and go on through. . . . Q. Doctor, in the case of the bronchus, when you say it can erode, could it also displace a part of the wall of the bronchus? A. Yes. Q. It could also, let's say, cause an indentation by virtue of the fact that it was pressing against it, is that correct, Doctor? A. Yes, sir." "Q. All right, and so if the biopsy were taken on the posterior wall, would it be at a point where you would normally not expect to find the pulmonary artery paralleling the course of that bronchus? A. That is right."

In this state of the evidence it was a question of fact for the judge to decide whether the basis for res ipsa loquitur had been laid. (*Seneris* v. *Haas, supra,* 45 Cal.2d 811, 827.) If he found in the affirmative on that question he was called upon to determine whether the inference of negligence thus raised had been met or overcome. The evidence being in conflict, the judge's decision that no negligence had been shown is conclusive.

We think the following passage from respondent's brief aptly summarizes the situation: "The fair inference from their [defendant's and Dr. Prietto's] testimony, if not as respondent believes the direct effect thereof, was that there was an aberrant pulmonary artery pushing into or within the wall of the bronchus at the point of the biopsy, where it would ordinarily not be located, and which there was no reason to suspect from the findings at bronchoscopy."

Judgment affirmed.

Fox, P. J., and Herndon, J., concurred.