Filed 12/8/15  Sanchez v. Scripps Health CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JANIS SANCHEZ et al., | D066005 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2011-00087471-CU-MM-CTL) |
| SCRIPPS HEALTH, | |
| Defendant and Respondent. | |

APPEAL from a judgment and postjudgment orders of the Superior Court of San Diego County, Kevin A. Enright, Judge.  Affirmed.

Hoyt E. Hart II, for Plaintiffs and Appellants.

Higgs, Fletcher & Mack, John Morris, William M. Low, and Kathryn A. Martin for Defendant and Respondent.

Janis and George Sanchez (collectively, the Sanchezes)[1] appeal from a judgment following a jury verdict in favor of Scripps Health (Scripps), doing business as Scripps Mercy Hospital, on their complaint for professional negligence and medical battery and a postjudgment order denying them judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial. They also appeal from a postjudgment order awarding Scripps costs under Code of Civil Procedure section 998.[2] We affirm the judgment and postjudgment orders.

I

FACTUAL AND PROCEDURAL BACKGROUND[3]

In March 2010, medical evaluations revealed a valve in Janis's heart was leaking. Cardiac surgeon John Jeffrey Tyner met with Janis and her husband George to discuss surgery and potential risks and recommended she provide two pints of blood. In early April 2010, Janis signed a form titled "Blood Transfusion, Patient and Physician Acknowledgment of Consent" (hereafter the April 1 form), indicating she received

---

[1]     For purposes of clarity we refer to Janis and George by their first names. We intend no disrespect.

[2]     All subsequent statutory references are to the Code of Civil Procedure unless otherwise noted.

[3]     In accordance with our substantial evidence review here (see standard of review discussion *post*), we "view the evidence in the light most favorable to the prevailing party" and discuss conflicting evidence only when relevant to the Sanchezes' appeal. (*People ex rel. Brown v. Tri-Union Seafoods LLC* (2009) 171 Cal.App.4th 1549, 1567 (*Brown*).)

information about blood options and transfusions, including possible posttransfusion problems.

On April 29, 2010, Janis was admitted to Scripps for the surgery, which Dr. Tyner performed. During the surgery, Janis received systemic heparin, a blood thinner, to prevent clotting in the catheter and heart-lung machine used in the procedure. She received a drug called protamine at the end of the surgery to reverse the effects of the heparin. On the form for postoperative orders, Dr. Tyner checked a box indicating "No Heparin at any time." Nurse Donna Serrano-Myers cared for Janis postsurgery.

Janis's condition began to deteriorate in the days after the surgery. By May 1, she was retaining fluids, including in the lungs. The doctors ordered diuretics to reduce the fluids. She also had a lower platelet count, so Dr. Tyner ordered an ELISA test to look for heparin antibodies. Heparin can lead to heparin-induced thrombocytopenia (HIT), in which a heparin antibody forms and causes thrombocytopenia, or low platelet count.[4] Janis's ELISA test results were negative.

By May 4, Janis was experiencing renal failure, among other medical issues. Dr. Theodore Thomas, a kidney specialist, recommended dialysis. Dr. Tyner inserted a dialysis catheter known as a vascath, which had two ports or "dwells." Dr. Thomas ordered heparin to be placed in the dwells at the end of the dialysis treatment, to prevent blood clotting in the catheter. Nurse Myers was on shift when the heparin was due to be

---

[4] HIT may be accompanied by thrombosis, or blood clots, and then is referred to as HITT. Thrombocytopenia has many causes besides HIT. We note the facts regarding Janis's platelet counts and HIT to the extent relevant to her appellate contentions. Whether Janis actually had HIT is not before us.

given, but could not do so because the heparin amount was omitted from the order. Nurse Dorothy DeGuzman, who relieved her, obtained clarification of the amounts (1.3 millimeters in one dwell, and 1.4 in the other) and placed the heparin in the dwells.

On May 5, Dr. Thomas determined Janis required daily dialysis and again ordered heparin in the dwells. She also had other significant medical concerns, reflecting multi-system failure. The attending physician ordered a platelet transfusion, which Nurse DeGuzman performed.

On the morning of May 6, doctors discovered Dr. Tyner mistakenly had inserted Janis's catheter into an artery, rather than a vein, because her blood pressure was sufficiently low the artery looked like a vein. A vascular surgeon removed the catheter with Dr. Tyner's assistance. In his postoperation transfer order, Dr. Tyner ordered heparin in the dwells. Janis's kidney failure persisted, dialysis continued, and George signed a written dialysis consent.

On May 7, Janis still was experiencing kidney failure and remained on dialysis. Dr. Thomas ordered heparin in the dwells for the last time and then discontinued heparin later that day. He changed to citrate because Janis was going to be receiving a permacath (a different kind of catheter) and he needed her blood clotting numbers normal, so he wanted to minimize the possibility of heparin interacting with the blood system. George signed a consent form for the permacath placement. In addition, the attending physician ordered another platelet transfusion, which Nurse Ani Sekayan performed.

Janis's condition improved, but it was evident to the doctors she would lose her feet and fingers and they eventually became gangrenous. She underwent bilateral below-

4

knee amputation at the end of May and amputation of her left ring and long fingers a few weeks later. She was discharged in June 2010. On June 17, 2010, Dr. Tyner dictated a transfer summary of her case. Among other observations, he noted that postsurgery "she [had] a lower platelet count . . . a heparin antibody was sent on May 1st and all heparin was removed and discontinued."

In March 2011, Janis and George filed suit against Scripps and other defendants. They subsequently filed a first amended complaint, claiming professional negligence, primarily in connection with the use of heparin, and medical battery arising from an alleged lack of consent for certain dialysis and platelet transfusion sessions.[5]

On April 24, 2013, Scripps made an offer to compromise under section 998, seeking dismissal with prejudice in exchange for the parties bearing their own fees and costs. The Sanchezes did not take the offer. In June 2013 Scripps provided its expert designation, identifying seven retained experts and nearly 30 nonretained experts; it supplemented this list in July 2013 with three additional retained experts. On August 1, 2013, Scripps made another section 998 offer to the Sanchezes, again proposing a fee and cost waiver. The Sanchezes rejected the second offer as well.

The case proceeded to trial against Scripps.[6] To support their negligence claims, the Sanchezes presented registered nurse Davina Leary as an expert witness on nursing standards. Nurse Leary interpreted Dr. Tyner's June 17 transfer summary statement

---

5     George also alleged a cause of action for loss of consortium, but that claim is not at issue in this appeal.

6     The parties represent the other defendants won summary judgment on statute of limitations grounds or settled.

5

about Janis's low platelet count and all heparin being discontinued as reflecting that, as of May 1, he wanted heparin removed due to the platelet issues and his postoperative no-heparin order therefore remained in effect. She then found the no-heparin order and heparin in the dwells order were in conflict. She opined the standard of care required the nurses to resolve that conflict with the doctors and they failed to do so.

In response to Nurse Leary, Scripps presented the expert testimony of Dr. Charles Landers, a specialist in internal medicine with a subspecialty in critical care. He testified there was no conflict between the heparin orders, as Dr. Tyner's order was understood to apply to postoperative systemic heparin, and the standard of care did not require clarification by the nurses. Dr. Landers further opined about the circumstances reflecting the absence of a conflict at the time of the later heparin order, including the deterioration in Janis's condition and the doctors' collaboration in her care.

The doctors and nurses who treated Janis also testified. Dr. Tyner confirmed his no-heparin order concerned postsurgery systemic heparin and his intent was to avoid large amounts of heparin in Janis's system. He explained he was not concerned with small amounts of heparin in the dwells and would have agreed with Dr. Thomas's order had the nurses called him. Dr. Thomas clarified the distinction between systemic heparin and heparin in the dwells, explaining heparin in the dwells is "just to sit there in the port. It's not to go anywhere." Nurse Myers testified she interpreted Dr. Tyner's no-heparin order as a routine request to avoid systemic heparin for 24 to 48 hours postsurgery and viewed the circumstances for the heparin in the dwells order as "completely different." As a result, she did not view them as conflicting and did not pass the no-heparin order

6

onward to Nurse DeGuzman. Nurse DeGuzman also testified she did not think the orders were in conflict, and Nurses Ani Sekayan and Sue Allard, who assisted in Janis's care, agreed.[7]

For the battery claim, the parties stipulated there was no written consent for dialysis prior to May 6. George testified he was aware Janis was fluid overloaded and they needed to reduce the fluid; he recalled Dr. Tyner told him they would need to do something else besides drugs to do that, although he did not use the word dialysis. George understood the dialysis process removed fluid from Janis, what the dialysis machine was (and that this was its purpose), and that it was essential to her survival. He never questioned the use of dialysis to either Dr. Tyner or Dr. Thomas. He also recalled Dr. Tyner told him about the need to insert a catheter.

Dr. Tyner testified he spoke with George daily and probably several times per day, especially as the situation became more difficult. He viewed Janis as being at risk of dying and felt dialysis had to be done right away. Although it was not his role to obtain consent for dialysis, he testified it would have been his standard to explain that it was necessary to remove fluid and dialysis was the only means. George never told him he was opposed to dialysis. Dr. Tyner recalled he did speak with George about the vascath and felt there was consent for that. As for Dr. Thomas, he testified he spoke with George on several occasions, including about Janis's need for dialysis. He too felt Janis was at risk of dying; he viewed dialysis as an emergency procedure and stated it would have

_____

[7] Although Nurse DeGuzman did not testify in person at the trial, her deposition testimony was read to the jury.

7

been unreasonable to wait for affirmative approval to proceed. He initially testified he did not recall or think he obtained consent for dialysis on May 4 and did not remember if he did so on May 5 or May 6; he subsequently recalled he could not get in touch with George.

Nurse Leary opined there was no documented informed consent for three dialysis treatments. Dr. Landers found George was fully aware Janis was receiving dialysis and had no reason to think he objected to it. He further noted dialysis was commenced in connection with efforts to save Janis's life.

With respect to the platelet transfusions, George testified Dr. Tyner recommended Janis provide blood, but did not mention blood transfusions. Dr. Tyner testified he did inform the Sanchezes there could be a need for a blood transfusion. Nurse DeGuzman, who performed the May 5 transfusion, explained her practice was to check for a consent and the records showed Janis had one (although she could not recall whether the particular form would constitute informed consent). Nurse Sekayan, who carried out the May 7 transfusion, recalled there was a consent in Janis's chart and said she would not have sought further consent except at physician direction. As for the experts, Nurse Leary testified the April 1 form did not suffice for the postsurgery transfusions, because circumstances had changed. Dr. Landers found the form sufficient to provide consent for the transfusions and that the standard of care did not require additional consent.

At the conclusion of the trial, the jury received a special verdict form containing separate questions on negligence and battery. The first negligence question asked whether Scripps had been negligent in the care and treatment of Janis. The jury answered

8

"No" and, per the form, was not required to answer the remaining negligence questions. The second question asked whether Scripps nurses performed medical procedures on Janis without consent. The jury answered "No" and again was not required to answer the other battery questions.

The Sanchezes moved for JNOV or, in the alternative, for a new trial, contending the evidence did not support the verdict and also claiming Scripps failed to establish any justification for lack of consent. The trial court denied the motion. It concluded there was evidence to support the negligence verdict, noting the witness testimony that the no-heparin order applied systemically and immediately postsurgery and Dr. Landers's opinions that there was no conflict in the heparin orders and the nurses complied with the standard of care. On battery, the court found George provided written consent for dialysis on May 6 and the jury could infer earlier consent based on his awareness of Janis's condition, understanding of dialysis, and lack of objection. It also found Janis signed the April 1 form, providing consent for the blood transfusions, and that Dr. Landers opined the standard of care did not require additional consent. Finally, the trial court found Scripps presented evidence in support of the emergency defense.

Scripps filed its memorandum of costs and the Sanchezes moved to tax costs. Relevant here, the Sanchezes claimed expert costs were not permitted absent a court order and that no experts were court-ordered; they also pointed out some experts never testified. The court granted the motion as to the experts who did not testify, but otherwise found Scripps had made two section 998 offers to waive costs, the offers were

9

reasonable under the circumstances, and Scripps could recover its remaining expert witness costs under section 998, subdivision (c).

The Sanchezes timely appealed.

## II

## DISCUSSION

### A.     *Sufficiency of the Evidence*

1.     Standard of Review

The Sanchezes challenge the judgment and order denying JNOV and a new trial based on the sufficiency of the evidence.

The parties disagree as to the applicable standard of review.  Scripps contends substantial evidence review applies and we agree.  (*Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1188 ["When a party contends insufficient evidence supports a jury verdict, we apply the substantial evidence standard of review"]; *Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68 [in reviewing a JNOV denial, the Court of Appeal determines whether "any substantial evidence . . . supports the jury's conclusion"]; *Charles D. Warner & Sons, Inc. v. Seilon, Inc.* (1974) 37 Cal.App.3d 612, 617 [abuse of discretion review applies to denial of new trial motion based on sufficiency of the evidence "in reviewing the trial court's exercise of discretion, . . . our power *begins* and *ends* with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury.].")

In applying substantial evidence review, we review the record to "determine whether there is any substantial evidence, contradicted or not contradicted, to support the

10

findings below.  We view the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences and resolving all conflicts in its favor."  (*Brown*, *supra*, 171 Cal.App.4th at p. 1567.)  "We do not reweigh evidence or assess the credibility of witnesses on review for substantial evidence."  (*San Diego Gas & Electric Co. v. Schmidt* (2014) 228 Cal.App.4th 1280, 1292 (*Schmidt*).)

The Sanchezes, however, contend their challenge involves the application of law to undisputed facts and we should apply de novo review.  They identify the following issues: whether the jury reasonably could find that Nurse Myers's "discontin[uation]" of the no-heparin order was not negligent; whether the jury could excuse consent for dialysis, which they state "the patient was never informed of"; and whether the April 1 form, which they describe as "contain[ing] no statement of consent" provides consent for postoperation blood transfusions.  Although we agree independent review may be appropriate when the facts are agreed or undisputed (*Nguyen v. Calhoun* (2003) 105 Cal.App.4th 428, 437), that is not the case here.  As we discuss *post*, the record contains evidence from which the jury could find the no-heparin order expired and was not discontinued, George was informed about and aware of the dialysis process, and the April 1 form provided consent for the transfusions.[8]

---

[8]     Scripps moves for waiver on the grounds the Sanchezes failed to set forth all material evidence on point.  The Sanchezes' treatment of Scripps's evidence is cursory, at best, but we deny the request and choose in the interests of justice to consider their arguments.

2.    Sufficiency of the Evidence on Negligence

The Sanchezes base their negligence claim on an alleged conflict between the heparin orders and the nurses' failure to resolve it, as well as Nurse Myers's purported discontinuation of Dr. Tyner's order.  In order to prove a claim of medical negligence, the plaintiff must establish the defendant breached the standard of care, which "requires that medical service providers exercise that reasonable degree of skill, knowledge and care ordinarily possessed and exercised by members of their profession under similar circumstances."  (*Alef v. Alta Bates Hospital* (1992) 5 Cal.App.4th 208, 215.)  "The standard of care against which the acts of a medical practitioner are to be measured is a matter peculiarly within the knowledge of experts; it presents the basic issue in a malpractice action and can only be proved by their testimony, unless the conduct required by the particular circumstances is within the common knowledge of laymen."  (*Ibid.*)

Here, the jury found Scripps was not negligent in its treatment of Janis.  The trial court found there was substantial evidence to support this verdict and we agree.  Expert witness Dr. Landers opined the heparin orders were not in conflict and the nurses complied with the standard of care.  Dr. Tyner and the nurses supported these conclusions, testifying the no-heparin order applied systemically and immediately postoperation and either stating or implying it was not in conflict with the later order for

12

heparin in the dwells.[9]  Indeed, Dr. Tyner himself ordered heparin in the dwells on May 6.  Dr. Thomas likewise distinguished systemic heparin from heparin in the dwells.

The Sanchezes contend this evidence was insufficient, arguing their expert, Nurse Leary, provided uncontradicted expert testimony the nurses fell below the standard of care, Dr. Landers's testimony lacked evidentiary value and was otherwise deficient, and there was no lawful basis on which Nurse Myers could have "discontinued" Dr. Tyner's no-heparin order.  We reject these contentions.

Nurse Leary's testimony was not uncontradicted.  Although she opined the heparin orders were in conflict and the nurses' failure to resolve the conflict fell below the standard of care, Dr. Landers disputed each of these opinions.  To the extent the Sanchezes suggest there is no conflicting evidence because Dr. Landers's views lack evidentiary value, we disagree.  Expert testimony constitutes substantial evidence "if based on conclusions or assumptions supported by evidence in the record," and Dr. Landers's testimony has such support.  (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.)

The Sanchezes' specific objections to Dr. Landers are similarly unpersuasive. They note Nurse Myers was not deposed and testified last at trial, so Dr. Landers could not have considered her conduct.  But their expert lacked Nurse Myers's testimony, for

---

[9]     The Sanchezes criticize Dr. Tyner's testimony, contending among other things that if he meant the postoperative heparin order was time limited, he should have said so, and that his testimony was vague.  We reject these arguments as going to witness credibility and the weight of the evidence, which we do not reassess on substantial evidence review. (*Schmidt*, *supra*, 228 Cal.App.4th at p. 1292.)

13

the same reason and, regardless, it was not critical to Dr. Landers's conclusions. They contend Dr. Landers's opinions depended on his view the doctors were collaborating and the evidence undermines this finding. However, Dr. Landers first testified the orders were not in conflict and then elaborated on the facts reflecting a lack of conflict, including not only the doctors' collaboration, but also Janis's worsening condition. The jury could have found Dr. Landers's opinions did not rely on the collaboration finding.

The Sanchezes also criticize Dr. Landers for failing to address the purportedly expanded purpose of Dr. Tyner's no-heparin order. They rely on Dr. Tyner's June 17 transfer summary, in which he noted Janis's lower platelet count and that "a heparin antibody was sent on May 1st and all heparin was removed and discontinued." Nurse Leary opined this statement reflected Dr. Tyner wanted heparin removed because of the lower platelet count and the no-heparin order remained in effect on May 1. However, Dr. Tyner testified he did not issue any order on May 1 to remove and discontinue heparin and the transfer summary statement referred to, if anything, his postoperative no-heparin order.[10] Moreover, Dr. Landers did testify as to the scope of the postoperative

_____

[10] The Sanchezes cite testimony from Dr. Tyner that purportedly reflects an expanded purpose, but the testimony is equivocal at best. In response to their question regarding how he accomplished the discontinuation referenced in the transfer summary, he said, "I did that in my post-op order." They then asked "When you were writing on May 1st, 'And all Heparin was removed and discontinued,' is that your intention at that point in time that this patient is not going to be receiving any Heparin exposure?" He responded "That's what -- again, it was on my post-op order." The cited testimony also does not reflect the Sanchezes asked him directly if he issued an expanded order on May 1.

14

no-heparin order, finding it was limited to systemic, postsurgery heparin and implicitly rejecting any expanded scope.[11]

Finally, they contend Nurse Myers's decision not to pass on Dr. Tyner's no-heparin order discontinued the order in violation of the law and the Scripps medical order policy and the jury could not reasonably have found this conduct other than negligent. First, based on the testimony of Dr. Landers, Dr. Tyner, and the nurses that the no-heparin order was intended to apply immediately postoperation, the jury could have found Nurse Myers did not discontinue anything. Second, and more important, the Sanchezes identify no expert testimony to suggest this purported discontinuation by Nurse Myers falls below the standard of care, as required to establish negligence. (*Alef*, *supra*, 5 Cal.App.4th at p. 215.) At most, they argue their expert found the two heparin orders presented a conflict requiring resolution by the nurses, an opinion contradicted by Scripps's expert. The jury reasonably could have concluded Nurse Myers did nothing wrong in perceiving no conflict and declining to pass on Dr. Tyner's order.

We conclude substantial evidence supports the jury's finding that Scripps was not negligent.

3.      Sufficiency of the Evidence on Battery

The Sanchezes' battery claim rests on their contention that Scripps carried out five medical procedures without consent: dialysis on May 5, 6, and 7 and platelet transfusions

---

11      The Sanchezes also contend Dr. Landers implied that because Janis needed dialysis, she also needed heparin, and the evidence negates this implication. However, the negligence issue is not whether Janis needed heparin, but rather, whether the nurses met the standard of care. Dr. Landers's conclusion that they met the standard does not depend on the inference that Janis actually needed heparin.

15

on May 5 and 7. To establish medical battery, a plaintiff must prove the defendant "perform[ed] a procedure without obtaining any consent." (S*axena v. Goffney* (2008) 159 Cal.App.4th 316, 324.) Consent may be provided by an authorized person when the patient is unable to consent and may be express or implied. (*Cobbs v. Grant* (1972) 8 Cal.3d 229, 244 (*Cobbs*); *Bradford v. Winter* (1963) 215 Cal.App.2d 448, 454 (*Bradford*).) The jury decided the Scripps nurses did not perform medical procedures on Janis without consent. The trial court found sufficient evidence to support this verdict, as do we.[12]

First, there was sufficient evidence for the jury to find consent to dialysis. The doctors recalled they spoke with George regularly; Dr. Thomas testified he discussed Janis's need for dialysis and Dr. Tyner stated it would have been his practice to do so. George testified he knew what dialysis was, understood it was necessary to save Janis's life, and did not object to the process. Given George's awareness of dialysis and its role in Janis's treatment, it would have been reasonable for the jury to infer consent from his lack of objection. (See *Kritzer v. Citron* (1950) 101 Cal.App.2d 33, 39 (*Kritzer*) [finding the "jury was privileged to infer a consent from the facts that the plaintiff submitted to the operation without objection and . . . [the husband] made no protest . . . ."].) George then

---

[12]    Scripps contends nurses are required only to document consent, not obtain it, and suggest a documentation failure by Scripps's nurses could not have damaged Janis. Because we find substantial evidence of consent, we do not reach this issue.

signed written consents for dialysis and the permacath, evidence of express consent.[13]

(See *Bradford*, *supra*, 215 Cal.App.2d at p. 454.)

The Sanchezes disagree, contending dialysis was never proposed to George. However, the evidence reflects the doctors did discuss dialysis with George, even if Dr. Tyner never used the precise term. The Sanchezes also suggest the doctors "admitted making no effort" to obtain informed consent until May 7. The record reflects no such admissions. Dr. Tyner simply said it was not his role to obtain consent for dialysis and he did obtain consent for the vascath. Dr. Thomas, meanwhile, first did not recall if he obtained consent and then said he was unable to reach George, neither of which is a concession he made no effort to do so.

Second, there was substantial evidence of consent to the platelet transfusions. The April 1 form was titled "Blood Transfusion, Patient and Physician Acknowledgment of Consent," suggesting its purpose is to reflect consent. The form itself reflects Janis's acknowledgement that she received information regarding the possible risks of blood transfusions. In addition, George testified Dr. Tyner said they might need blood on hand and Dr. Tyner recalled discussing transfusions with the Sanchezes (although George did not remember this). The nurses who performed the transfusions viewed the form as providing consent, although one could not recall specifically whether the form was sufficient for informed consent. Dr. Landers opined the transfusions did not require

---

13    The Sanchezes state Scripps admitted there was no consent to dialysis until May 6. The record reflects Scripps stipulated only that there was no *written* consent prior to May 6, not no consent at all.

additional consent. Based on all of this evidence, the jury could conclude there was consent for the platelet transfusions.

The Sanchezes contend the April 1 form was intended only to document the provision of information regarding blood transfusions, not consent, and the deterioration in Janis's condition postsurgery required new consent anyway. However, they identify no evidence presented to the jury to prove the April 1 form was not a consent form. If anything, Nurse Leary's testimony that the postsurgery transfusions required additional consent suggests she found the form sufficient to provide at least some consent (indeed, she acknowledges the earlier "authorization"). Dr. Landers and at least one nurse disagreed new consent was required. The jury had no reason to view the April 1 form as anything *but* a consent form and could reasonably find the later transfusions required no additional consent.

The Sanchezes identify several cases to support their consent arguments, but none undermine the sufficiency of the evidence. They cite *Cobbs*, *supra*, 8 Cal.3d 229, 239-243 and other authorities for the general proposition that consent must be informed, but their argument, as we understand it, is that there was no consent for the procedures at issue, informed or otherwise. They also purport to distinguish *Bradford* and *Kritzer*, both of which found consent, suggesting neither establishes consent can be inferred from a failure to object when there has been no disclosure. (See *Kritzer*, *supra*, 101 Cal.App.2d at p. 38 [patient verbally confirmed consent to procedure, after circumstances changed]; *Bradford*, *supra*, 215 Cal.App.2d at p. 454 [patient's written consent to a bronchoscopy encompassed subsequent biopsy, which was a normal incident of the bronchoscopy].)

18

However, there is evidence of disclosure here, in that the doctors spoke with George about dialysis and he was aware of the process, and the cases reflect consent can be implied, including through lack of objection. (See *Kritzer*, at p. 39 [observing the jury could infer consent from lack of objection by plaintiff or her husband]; *Bradford*, at p. 454 [recognizing "[c]onsent . . . may be implied from the circumstances"].)[14]

Finally, the Sanchezes argue the trial court erred in finding Scripps provided evidence of emergency in its JNOV/new trial order, noting the jury never answered the question and contending there was insufficient evidence to support the ruling. We need not reach the issue. The Sanchezes are correct the jury did not reach the issue, but it was because they did not have to, having found consent. The trial court's ruling was unnecessary, but also harmless; it did not impose (or fail to impose) liability inconsistent with the jury's verdict. (Compare *Dee v. PCS Property Management, Inc*. (2009) 174 Cal.App.4th 390, 406 (*Dee*) [rejecting challenge to causation rulings where jury found no negligence and was not required to decide causation, finding any error would be harmless] with *Hansen v. Sunnyside Products, Inc*. (1997) 55 Cal.App.4th 1497, 1511 (*Hansen*) [reversing JNOV on comparative negligence following a negligence verdict for defendant where, among other things, the "jury never reached" the issue "because the special verdict form told them they need go no further"].) Even if the Sanchezes could

---

14    The Sanchezes also challenge consent based on noncompliance with the Scripps informed consent policy in the alleged absence of an emergency. It was for the jury to weigh the relevance of the policy in determining whether there was consent. To the extent the Sanchezes are suggesting implied consent can exist only in an emergency, we disagree. (*Kritzer*, *supra*, 101 Cal.App.2d at p. 39 ["Plaintiffs' argument that consent may be implied only where an emergency exists overlooks the fact that in an emergency . . . , there is actually no consent whatsoever to an invasion of the patient's interests].)

demonstrate there was no substantial evidence to support the emergency ruling, this

"would not require reversal." (*Dee*, at p. 406.)[15] In any event, we observe the record

does reflect ample evidence of exigent circumstances throughout the relevant timeframe.

We find there is substantial evidence to support the jury's finding that Scripps

nurses did not perform procedures without consent.

### B. *Award of Costs Under Section 998*

The Sanchezes contend the trial court abused its discretion in awarding Scripps

expert costs under section 998, arguing the offers were not reasonable.[16] We review the

court's award of expert witness fees under section 998 for abuse of discretion. (*Jones v.

Dumrichob* (1998) 63 Cal.App.4th 1258, 1262 (*Jones*).) Applying this standard, we

reject the Sanchezes' contentions.

"The purpose of section 998 is to encourage the settlement of litigation without

trial. [Citation.] To effectuate the purpose of the statute, a section 998 offer must be

---

15    We note it was the Sanchezes who alleged in their JNOV/new trial motion that
Scripps had not presented evidence to justify lack of consent, although the jury did not
reach this portion of the verdict form. The trial court's decision to rule on emergency not
only was superfluous, but also may have been procedurally improper (although harmless
under the circumstances). (*See Hansen*, *supra*, 55 Cal.App.4th at p. 1511 [observing
"multiple procedural problems" with JNOV, including a ruling on an issue the jury had
not reached]; *Simmons v. Ware* (2013) 213 Cal.App.4th 1035, 1047 [finding it
"procedurally improper" for trial court to grant JNOV on issue, where, among other
things, the issue was never presented to the jury].)

16    Section 998, subdivision (c)(1), provides in part: "If an offer made by a defendant
is not accepted and the plaintiff fails to obtain a more favorable judgment or
award, . . . the court . . . , in its discretion, may require the plaintiff to pay a reasonable
sum to cover costs of the services of expert witnesses, who are not regular employees of
any party, actually incurred and reasonably necessary in either, or both, preparation for
trial . . . , or during trial . . . , of the case by the defendant."

20

made in good faith to be valid. [Citation.] Good faith requires that the pretrial offer of settlement be 'realistically reasonable under the circumstances of the particular case. Normally, therefore, a token or nominal offer will not satisfy this good faith requirement, . . . .' [Citation.] The offer must 'carry with it some reasonable prospect of acceptance.' " (*Jones*, *supra*, 63 Cal.App.4th at p. 1262.)

A section 998 offer for a waiver of costs may have "significant monetary value" where the party is "waiving [its] considerable cost bill." (*Jones*, *supra*, 63 Cal.App.4th at p. 1263 [finding no abuse of discretion in awarding expert fees pursuant to a section 998 offer consisting of a cost waiver, but no monetary amount]; see *Adams v. Ford Motor Co*. (2011) 199 Cal.App.4th 1475, 1485 (*Adams*) ["[A] section 998 offer has value beyond the monetary award provided if it also includes a waiver of costs . . . ."]; *Bates v. Presbyterian Intercommunity Hospital, Inc*. (2012) 204 Cal.App.4th 210, 214, 222 [finding section 998 offer to waive costs and refrain from pursuing malicious prosecution claim "had substantial value when weighed against appellant's prospects of success"].) "The reasonableness of a . . . section 998 settlement offer is evaluated in light of 'what the offeree knows or does not know at the time the offer is made.' " (*Adams*, at p. 1485.)

Here, Scripps's section 998 offers proposed a waiver of costs and attorney fees. Its costs bill, including the disputed expert witness fees, totaled over $287,000, of which approximately $235,000 was witness fees. The court awarded over $250,000. The Sanchezes cannot reasonably contend these amounts are insubstantial. (*Jones*, *supra*, 63 Cal.App.4th at p. 1264 ["Facially, respondent's offer carried a significant value to appellants because, if accepted, it would have eliminated appellants' exposure to the very

21

costs which are the subject of this appeal, a sum appellants can hardly claim now to be de minimis"]; accord *Adams*, *supra*, 199 Cal.App.4th at p. 1485.) It should have been apparent to the Sanchezes that Scripps was incurring significant expert fees, at least as of the second section 998 offer in August 2013. By that time, the case had been going on for over two years and Scripps had designated seven retained experts and dozens of unretained experts. Further, Scripps did in fact prevail at trial. That "result itself constitutes prima facie evidence that the offer was reasonable . . . ." (*Jones*, at p. 1264.)[17]

The record supports the trial court's conclusion that the section 998 offer was reasonable "under all of the circumstances." We find the trial court did not abuse its discretion in awarding Scripps its expert witness costs.

C.      *Appeal Not Frivolous*

Scripps filed a motion for sanctions against the Sanchezes and their attorney for filing a frivolous appeal. Although we conclude the appeal lacked merit for the reasons stated, we do not find the appeal to be frivolous and, therefore, deny the motion.

---

17      The Sanchezes argue token offers are appropriate only for meritless cases and settlements with other defendants reflect their case was not lacking in merit. Those settlements are irrelevant to the Sanchezes' case against Scripps, which the jury decided in Scripps's favor. Moreover, we find Scripps's offer had value, meaning even if the Sanchezes' case had some merit, the trial court still could have found the offer was not a mere token. (*Jones*, *supra*, 63 Cal.App.4th at p. 1264.)

III

DISPOSITION

The judgment and postjudgment orders are affirmed. The motion for sanctions is denied. Respondent is awarded costs on appeal.


McCONNELL, P. J.

WE CONCUR:


NARES, J.


PRAGER, J.*

---

\*      Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.